



## Central Virginia Regional MLS
## Purchase Agreement

This is a legally binding document for the purchase of real property. If not understood, seek competent advice before signing.
(Paragraphs marked with an asterisk * require a blank to be filled in or checked.)

*This Purchase Agreement (the "Agreement") is dated 02/19/2021_____, 20___, between _Cicel Johnson_____
_____ ("Purchaser") and _HPA Borrower 2016-2 ML LLC_____
_____("Seller"). The parties acknowledge ___N/A_____ ("Listing
Broker") represents Seller, and __N/A_____ ("Selling Broker") represents Purchaser.

**\*1. REAL PROPERTY:** Purchaser agrees to buy and Seller agrees to sell the land, all improvements thereon, and appurtenances thereto belonging, located in the City/County of _Chesterfield_____, Virginia. Lot ___Block ___Section ___ subdivision, Tax Parcel # _742-67-62-14-000-000_____ and more commonly known as: _5105 Claypoint Rd, Chesterfield, VA, 23832_____ together with the items of personal property described in paragraph 2 (the "Property").

**\*2. PERSONAL PROPERTY INCLUDED:** Included with the sale of the above real estate (if located within said Property at the time of signing this Agreement, unless otherwise noted) are the shades, plantation shutters, blinds, curtain and drapery rods, screens and screen doors, storm windows and doors, light fixtures, wall to wall carpeting, garbage disposal, built-in range, built-in oven, built-in dishwasher, laundry tubs, attic fan, smoke and heat detectors, awnings, electrical wiring connections for appliances, ceiling fan(s), garage door opener(s) and remotes, mailbox and post, outbuildings and sheds, gas logs, fireplace inserts and all other items attached to the real estate and being a part thereof, including all shrubbery and plantings on the Property. Also included are the following items:
_Buyer resides at property - any and all personal property and fixtures located thereon to the extent owned by Seller remains._____
_____

**\*3. ADDENDA:** The following addenda are made a part of this Agreement:

[X] Lead-Based Paint Disclosure (required on all pre-1978 homes)    ☐ Right of First Refusal    ☐ Short Sale Addendum

[✓] "AS IS" Addendum    ☐ Other _____

**\*4. PURCHASE PRICE:** The Purchase Price of the Property is _____ Dollars ($_343,100.00_____), which shall be paid to Seller at settlement, subject to the pro-rations described herein and/or from the following sources **[check all applicable box(es)]:**

[✓] This sale is _not_ subject to financing. Purchaser shall pay all cash at closing by bank certified funds or bank wire.

☐ This sale _is_ subject to financing. This is subject to Purchaser being able to obtain or assume a **[select loan type]:**

   ☐Conventional; ☐FHA; ☐VA; ☐VHDA or ☐other _____ loan in the principal amount of ____% of the Purchase Price **OR** $_____ ("Loan Amount"), secured by a first deed of trust lien on the Property bearing interest at a **[select one box]:**

      ☐ fixed rate not exceeding ____% per year    **OR**
      ☐ at an adjustable rate with an initial rate not to exceed ____% per year and a maximum rate not to exceed ___% during the term of the loan **OR**
      ☐ at the prevailing rate of interest at the time of settlement.

   The loan shall be amortized for a term of ___ years and shall require not more than a total of ____ discount and origination points. (For loan assumption, the balance set forth above is approximate. The principal amount to be assumed will be the outstanding principal balance on the date of settlement. Purchaser shall assume all obligations of Seller under such loan with the exception of past due charges for which Seller shall be liable). Purchaser shall pay the balance of the Purchase Price at settlement, less any deposit, loan amount and/or other credits set forth in this Agreement. Nothing in this Agreement prohibits Purchaser from seeking financing other than as specified above so long as settlement is not delayed and there is no cost to Seller. Purchaser's failure to obtain such alternative financing does not relieve Purchaser from the obligations to obtain the financing specified above.

   ☐ Seller agrees to pay at settlement (to be reflected on the settlement statement) the sum of $_____ towards Purchaser's closing costs, prepaids, discount points and loan expenses.

DocuSign Envelope ID: 5BF5A68B-B3F3-4922-8CD0-B94456AFA121

**\*5. APPRAISAL:** This sale **[select one]:** ☑ is **OR** ☐ is not further subject to the Property's appraised value equaling or exceeding the Purchase Price, which value shall be determined by an appraiser selected by Purchaser's lender (if a cash purchase, the appraiser shall be selected by Purchaser). **The appraisal shall be ordered within fifteen (15) days of the Date of Ratification. It shall be the responsibility of Purchaser to advise Purchaser's lender of this requirement.** If the appraisal is not ordered within 15 days of the Date of Ratification, then Seller may terminate this Agreement by written notice to Purchaser and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder.  If the appraisal is ordered after the 15 day period but Seller has not yet terminated this Agreement, then Seller's right to terminate this Agreement for said purpose is waived.

Regarding the appraisal, if the Purchase Price exceeds the appraised value, Purchaser shall either: (i) proceed with consummation of this Agreement without regard to the amount of the appraised value, or (ii) make a written request to Seller within five (5) days of receipt of the appraisal for a reduction in the Purchase Price so long as the reduced Purchase Price is not lower than the appraised value, and provide Seller a copy of the appraisal (or lender verification of the appraised value).  Seller shall then have five (5) days to respond to Purchaser's request for a reduction in the Purchase Price (the "Response Deadline").  If the parties are unable to agree in writing as to a Purchase Price within five (5) days following the Response Deadline, then either Purchaser or Seller may terminate this Agreement by written notice to the other party, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder. For purposes of this paragraph, Purchaser is deemed to have received a copy of the appraisal when Purchaser is notified in writing of the appraised value of the Property. If Purchaser does not request a reduction in the Purchase Price within five (5) days after receipt of the appraisal, then this condition shall be deemed waived by Purchaser.

**6. FINANCING:** If this Agreement is conditioned upon Purchaser obtaining financing, Purchaser shall make written application for such loan within seven (7) days after the Date of Ratification (as defined in Paragraph 27) and shall make diligent effort to secure a written loan commitment no later than 5:00 p.m. on the settlement date set forth in Paragraph 9. If, at the time of such loan application, Purchaser chooses not to lock-in the rate and/or points that meet or exceed the requirements set forth in Paragraph 4, Purchaser waives such rate and point contingency. If this Agreement is not conditioned upon Purchaser obtaining financing, Purchaser shall provide Seller with written verification from a third-party in possession of Purchaser's assets within seven (7) days after the Date of Ratification that Purchaser has sufficient assets to pay the balance of the Purchase Price at settlement. If Purchaser fails to comply with any of the provisions of this paragraph or fails to obtain a written loan commitment by 5:00 p.m. on the settlement date, then Seller may terminate this Agreement by written notice to Purchaser, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder. As used in this paragraph, "diligent effort" shall mean that Purchaser has provided all information or documentation requested by a lender within seven (7) days of each such request and paid all costs associated with such loan application, including but not limited to, application fees, credit reports and appraisal(s). Purchaser authorizes the lender to: (i) disclose to the Listing Broker and Selling Broker information about the progress of Purchaser's loan application and approval, including whether Purchaser has complied with the lender's requests and paid all costs associated with such application; and (ii) furnish a copy of Purchaser's loan estimate(s) and closing disclosure(s) to the Selling Broker.  If, after diligent effort, Purchaser is unable to obtain financing, then this Agreement shall terminate, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

**7. WIRE FRAUD ALERT:**  Criminals are hacking email accounts of real estate agents, settlement attorneys/agents and others resulting in fraudulent wire instructions being sent to divert Seller or Purchaser's funds to the criminal's account. These emails look legitimate, but they are not. ***Purchaser and Seller are advised not to wire any funds without personally speaking with the intended recipient of the wire to confirm the bank routing number and account number****.*

**\*8. DEPOSIT:** Purchaser shall make a deposit of $ <u>1,000.00</u> to be held by <u>Shaheen Law Firm, PC</u> (the "Escrow Agent") in the form of: ☐ check ☐ cash ☑ other <u>per escrow agent/wire</u> (the "Deposit"). Purchaser **[select one]:** ☑ has paid the Deposit to the Escrow Agent **OR** ☐ will pay the Deposit to the Escrow Agent within _____ days (the "Extended Deposit Date") after the Date of Ratification.  If Purchaser fails to pay the Deposit as set forth herein, then Purchaser shall be in breach of this Agreement.  At Seller's option and in lieu of all other remedies set forth in this Agreement, Seller may terminate this Agreement by written notice to Purchaser and neither party shall have any further obligation hereunder. If the Escrow Agent is a Virginia Real Estate Board ("VREB") licensee, the parties direct the Escrow Agent to place the Deposit in an escrow account by the end of the fifth business banking day following the latter of: (i) ratification and delivery of this Agreement as defined in Paragraph 27, or (ii) the Extended Deposit Date.  If the Escrow Agent is not a VREB licensee, the parties direct the Escrow Agent to place the Deposit in an escrow account in conformance with applicable Federal or Virginia law and regulations.  The Deposit may be held in an interest bearing

InstanetFORMS

account and the parties waive any claim to interest resulting from such Deposit. The Deposit shall be released by the Escrow Agent until (i) credited toward the purchase price at settlement; (ii) Seller and Purchaser agree in writing as to its disposition, (iii) a court of competent jurisdiction orders a disbursement of the funds, or (iv) disbursed in such manner as authorized by the terms of this Agreement subject to Virginia law and/or VREB Regulations. Seller and Purchaser agree that Escrow Agent shall have no liability to any party for disbursing the Deposit in accordance with this paragraph, except in the event of Escrow Agent's negligence or willful misconduct.

If the Property is foreclosed upon while this Agreement is pending, the terms of Virginia Code Section 54.1-2108.1 shall apply to the disbursement of the Deposit. The foreclosure shall be deemed a termination of this Agreement by Seller and, absent any default by Purchaser, the Deposit shall be disbursed to Purchaser.

**\*9. SETTLEMENT; POSSESSION:** Settlement shall be made at the offices of _____Shaheen Law Firm, PC_____
on or before **[select one box and insert closing date]**:

☑ _04/12/2021_____, 20_____, or a reasonable time thereafter if the Purchaser or Seller is making diligent effort to satisfy any contingencies contained in this Agreement.

**OR**

☐ _____, 20___, and subject to Seller's right to cure any title defects as set forth in Paragraph 24B, if settlement does not occur within ten (10) days following such date, a party who is ready, willing and able to close under the terms of this Agreement may terminate this Agreement by written notice to the other party, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

**Possession of the Property shall be given at settlement, unless otherwise agreed in writing by the parties**. Failure to check one box above shall not invalidate this Agreement. The settlement date shall be as inserted above. Seller and Purchaser authorize and direct the settlement agent to provide a copy of Purchaser's closing disclosure (if Purchaser obtains lender financing), settlement statement and/or disbursement summary for this transaction to the Seller, Purchaser, Listing Broker and Selling Broker.

**\*10. OCCUPANCY DISCLOSURE:** Purchaser intends to **[select one]:** ☑ occupy **OR** ☐ not occupy the Property as a principal residence.

**\*11. RESIDENTIAL PROPERTY DISCLOSURE:** Seller represents the Property **[select one]:**☑ is **OR**☐is not subject to the Virginia Residential Property Disclosure Act, Sections 55-517 et. seq. of the Code of Virginia, which requires the Seller of certain residential property to furnish the Purchaser with a Residential Property Disclosure Statement. Property Disclosure **[select one]:**☑is **OR**☐is not attached. (Attachment does not become part of this Agreement.)

**12. FAIR HOUSING DISCLOSURE:** All offers shall be presented and considered without regard to race, color, religion, sex, handicap, familial status, elderliness or national origin as well as all classes protected by the laws of the United States, the Commonwealth of Virginia and applicable local jurisdiction.

**\*13. PROPERTY OWNERS' ASSOCIATION DISCLOSURE:** The Seller represents that the Property **[select one]:**
☐is **OR** ☑is not located within a development which is subject to the Virginia Property Owners' Association Act (Sections 55-509 et. seq. of the Code of Virginia) (the "Act"). If the Property is within such a development, the Act requires the Seller to obtain from the property owners' association an association disclosure packet and provide it to the Purchaser, or Purchaser's authorized agent. The information contained in the association disclosure packet shall be current as of the specified date on the disclosure packet. The Purchaser may cancel this Agreement (a) within 3 days after the date of this Agreement, if on or before the date that the Purchaser signs this Agreement, the Purchaser receives the association disclosure packet or is notified that the association disclosure packet is not available; (b) within 3 days after receiving the association disclosure packet, if the association disclosure packet or notice that the association disclosure packet will not be available is hand delivered, delivered by electronic means or delivered by a commercial overnight delivery service or the United Parcel Service, and a receipt obtained; or (c) within 6 days after the postmark date if the association disclosure packet or notice that the association disclosure packet will not be available is sent to the Purchaser by United States mail. The Purchaser may also cancel this Agreement at any time prior to settlement if the Purchaser has not been notified that the association disclosure packet will not be available and the association disclosure packet is not delivered to the Purchaser. Notice of cancellation shall be provided to the Seller (owner) or his agent by one of the following methods: (i) hand delivery; (ii) United States mail, postage prepaid, provided the sender retains sufficient proof of mailing, which may be either a United States postal certificate of mailing or a certificate of service prepared by the sender confirming such mailing; (iii) electronic means provided the sender retains sufficient proof of the electronic delivery, which may be an electronic receipt of delivery, a confirmation that the notice was sent by facsimile, or a

certificate of service prepared by the sender confirming the electronic delivery; or (iv) overnight delivery using a commercial service or the United States Postal Service. In the event of a dispute, the sender shall have the burden to demonstrate delivery of the notice of cancellation. Such cancellation shall be without penalty, and the Seller shall cause any deposit to be returned promptly to the Purchaser, but not later than thirty days from the date of cancellation. Seller shall provide written instructions to the Association for delivery of the disclosure packet to Purchaser or Purchaser's authorized agent. The right to receive the association disclosure packet and to cancel this Agreement terminates at settlement. If the Purchaser has received the association disclosure packet, the Purchaser has a right, at Purchaser's sole expense, to request an update of such disclosure packet from the property owners' association in accordance with subsection G of Section 55-509.6 or subsection C of Section 55-509.7 as appropriate.  A request for an updated disclosure packet does not extend the cancellation periods set forth above.

**\*14. CONDOMINIUM DISCLOSURE:** The Seller represents that the Property **[select one]:**  ☐ is **OR** ☑ is not  a condominium resale, which is subject to the Virginia Condominium Act (Section 55-79.39 et seq. of the Code of Virginia) (the "Condominium Act"). If the Property is a condominium resale, the Condominium Act requires the Seller to obtain from the unit owners' association a resale certificate and provide it to the Purchaser or Purchaser's authorized agent. The information contained in the resale certificate shall be current as of the specified date on the resale certificate. The Purchaser may cancel this Agreement (a) within 3 days after the date of this Agreement, if on or before the date that the Purchaser signs this Agreement, the Purchaser receives the resale certificate; (b) within 3 days after receiving the resale certificate if the resale certificate is hand delivered, delivered by electronic means or delivered by a commercial overnight delivery service or the United Parcel Service, and a receipt obtained; or (c) within 6 days after the postmark date if the resale certificate is sent to the Purchaser by United States mail. Notice of cancellation shall be provided to the Seller (owner) or his agent by one of the following methods: (i) hand delivery; (ii) United States mail, postage prepaid, provided the sender retains sufficient proof of mailing, which may be either a United States postal certificate of mailing or a certificate of service prepared by the sender confirming such mailing; (iii) electronic means provided the sender retains sufficient proof of the electronic delivery, which may be an electronic receipt of delivery, a confirmation that the notice was sent by facsimile, or a certificate of service prepared by the sender confirming the electronic delivery; or (iv) overnight delivery using a commercial service or the United States Postal Service. In the event of a dispute, the sender shall have the burden to demonstrate delivery of the notice of cancellation. Such cancellation shall be without penalty, and the Seller shall cause any deposit to be returned promptly to the Purchaser, but not later than thirty days from the date of cancellation. Seller shall provide written instructions to the Association for the delivery of the resale certificate to Purchaser or Purchaser's authorized agent. The right to receive the resale certificate and to cancel this Agreement terminates at settlement. If the Purchaser has received the resale certificate, the Purchaser has a right, at Purchaser's sole expense, to request from the unit owners' association a resale certificate update or financial update in accordance with Section 55-79.97:1. A request for an updated resale certificate does not extend the cancellation periods set forth above.

**15. OWNERS' ASSOCIATION REPAIRS:**  If a disclosure packet, resale certificate or inspection report from a Property or Condominium Owners' Association indicates the Property is not in compliance with the Association's governing documents, then Purchaser may request in writing within five (5) days from receipt of any such disclosure packet, resale certificate or inspection report that Seller, at Seller's expense, make any repairs, perform any maintenance or take any corrective action required to conform the Property to the Association's requirements prior to settlement.  If any such repairs, maintenance or corrective action is not performed prior to settlement, then Purchaser may terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder. If Purchaser does not make a written request to Seller within five (5) days after receipt of the disclosure packet, resale certificate or inspection report containing such non-compliance notice, then Purchaser's right to make such request to Seller or to terminate this Agreement shall be deemed waived.

**\*16. PROPERTY INSPECTION [select one]:**

☑Purchaser waives a property inspection of the Property.

    **OR**

☐Seller hereby grants to Purchaser the right to have the Property inspected by a licensed home inspector or other person(s) selected by Purchaser at Purchaser's expense and to request repair of defects revealed and/or a Seller paid closing cost credit to Purchaser (**Purchaser's requested repairs and Seller paid closing cost credit shall be collectively referred to herein as the "**Repair Request**"**). Inspections may include, but are not limited to, all structural and building components and systems, radon gas, underground storage tanks, soil condition, environmental testing and engineering studies. The term "***defects***" as used in this paragraph 16 shall mean (***i) a condition which impairs the normal stability, safety or use of any improvements (buildings) on the Property, or (ii) damage to any part of the***

InstanetFORMS

*improvements, but shall exclude any cosmetic flaws, antiquated systems or grandfathered components that are in working order but would not comply with current building code if constructed or installed today.*

Purchaser shall provide Seller with all inspection reports, cost of repairs and Purchaser's written Repair Request no later than **[select one]:** ☐ ____ days after the Date of Ratification  **OR** ☐_____ (  a.m./ p.m.) on _____. If no box is checked, the parties agree that Purchaser shall provide Seller with all inspection reports, cost of repairs and a written Repair Request no later than ten (10) days after the Date of Ratification.  In the Repair Request, Purchaser reserves the right to request certain repairs be performed by a contractor currently licensed by the Virginia Board of Contractors, but shall not request Seller to perform any inspections of the Property.  If Purchaser does not submit to Seller all inspection reports, cost of repairs and the Repair Request by said date, then Purchaser waives the right to request repairs and/or a Seller paid closing cost credit, agrees that the present condition of the Property is satisfactory, and will proceed to settlement in accordance with the Purchase Agreement. Seller shall respond in writing to Purchaser's Repair Request within seven (7) days of its receipt (the "Negotiation Period"). If Seller agrees in writing to accept such Repair Request, then the parties shall proceed to settlement. If Seller does not respond in writing within the Negotiation Period, then Seller shall be deemed to have rejected Purchaser's Repair Request.

If Purchaser's Repair Request is not accepted by Seller, then the parties may continue to negotiate the terms of the Repair Request during the Negotiation Period.  Once a party rejects an offer or presents a counteroffer to the other party, then all prior offers and counteroffers made by either party regarding the Repair Request shall be deemed rejected so that only one Repair Request offer or counteroffer at a time shall be considered.  Seller may not require Purchaser to accept a Seller paid closing cost credit to Purchaser in lieu of repairs requested by Purchaser.  Further, no party may unilaterally terminate this Agreement during the Negotiation Period.

If, by 5:00 p.m. on the seventh (7th) day of the Negotiation Period, no final agreement is reached as to the Repair Request, then Purchaser shall have until 5:00 p.m. on the second (2nd) day after the end of the Negotiation Period to either: (i) terminate this Agreement by written notice to Seller, or (ii) accept in writing Seller's last offer regarding the Repair Request and proceed to settlement.  If Purchaser terminates this Agreement or fails to notify Seller of its election within the said two (2) day period, then this Agreement shall terminate, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

All repairs pursuant to Paragraph 16 shall be made in a workmanlike manner prior to settlement or such other time as agreed to by the parties. Unless otherwise agreed to by the parties, Seller shall provide Purchaser with paid receipts for all repairs prior to settlement or if repairs are to be paid from Seller's proceeds, Seller shall provide written invoices to Purchaser and the settlement agent directing disbursement of Seller's proceeds for payment of said invoices.

Seller shall have all utilities supplied to all systems prior to the inspection.  If Seller fails to have all utilities supplied to all systems prior to Purchaser's inspection, then the expiration of the inspection period set forth above shall be extended until ten (10) days following the date that Purchaser is notified by Seller that all utilities have been supplied to all systems. Purchaser and Seller, their heirs and assigns, hereby jointly and severally release and forever discharge the Listing and Selling Brokers and their real estate licensees in this transaction, from any and all liabilities, obligations, causes or action, claims and demands whatsoever arising out of or in any way connected with any or all work performed, materials furnished or inspections performed in connection with the captioned Property by contractors, suppliers or inspectors hired by them on behalf of the parties to this Agreement. Purchaser and Seller acknowledge that the provisions of this Paragraph 16 are in addition to treatments or repairs made pursuant to Paragraphs 15, 24E, 24F and 24G.

**17. DEFAULT:** If either Seller or Purchaser defaults under this Agreement, the defaulting party, in addition to all other remedies available at law or in equity, shall be liable for the brokerage fees set forth in Paragraph 19 and any brokerage fees set forth in Seller's Listing Agreement with the Listing Broker for the Property (which document is hereby incorporated herein by this reference) as if this Agreement and Seller's Listing Agreement had been performed, and for any damages and all expenses incurred by the non-defaulting party, the Listing Broker and the Selling Broker in connection with this transaction and the enforcement of this Agreement and Seller's Listing Agreement, including, without limitation, attorney's fees and court costs. Payment of a real estate broker's fee as the result of a transaction relating to the Property which occurs subsequent to a default under this Agreement, shall not relieve the defaulting party of liability for any brokerage fees due under this Agreement or Seller's Listing Agreement, or for any damages and expenses, including attorney's fees and court costs, incurred by the non-defaulting party, the Listing Broker and the Selling Broker in connection with this transaction.

**18.  Choice of Settlement Agent: Chapter 27.3 (§ 55-525.16 et seq.) of Title 55 of the Code of Virginia provides that the purchaser or borrower has the right to select the settlement agent to handle the closing of this transaction. The settlement agent's role in closing this transaction involves the coordination of numerous**

administrative and clerical functions relating to the collection of documents and the collection and disbursement of funds required to carry out the terms of the contract between the parties. If part of the purchase price is financed, the lender for the purchaser will instruct the settlement agent as to the signing and recording of loan documents and the disbursement of loan proceeds. No settlement agent can provide legal advice to any party to the transaction except a settlement agent who is engaged in the private practice of law in Virginia and who has been retained or engaged by a party to the transaction for the purpose of providing legal services to that party.

Variation by agreement: The provisions of Chapter 27.3 (§ 55-525.16 et seq.) of Title 55 of the Code of Virginia may not be varied by agreement, and rights conferred by this chapter may not be waived. The seller may not require the use of a particular settlement agent as a condition of the sale of the property.

Escrow, closing, and settlement service guidelines: The Virginia State Bar issues guidelines to help settlement agents avoid and prevent the unauthorized practice of law in connection with furnishing escrow, settlement or closing services. As a party to a real estate transaction, the purchaser or borrower is entitled to receive a copy of these guidelines from his settlement agent, upon request, in accordance with the provisions of Chapter 27.3 (§ 55-525.16 et seq.) of Title 55 of the Code of Virginia.

~~19. BROKERAGE FEE:~~ Seller authorizes and directs the settlement agent to disburse to ~~Listing Broker and Selling~~ Broker from the settlement ~~proceeds their respective brokerage fees payable as a result~~ of the sale and settlement set forth under this Agreement.  Prior to settlement, ~~Listing Broker and/or Selling~~ Broker shall deliver to the settlement agent a signed written ~~statement setting forth~~ the disbursement instructions for payment of any ~~brokerage fees~~ and any sales ~~incentives payable~~ to each broker.

*20. HOME WARRANTY INSURANCE: Purchaser has been advised of the availability of a one year warranty program and ☐ declines coverage  OR  ☐ elects to purchase the home warranty program. The cost of the _____ home warranty program is $_____ and is to be paid by ☑ Purchaser  OR  ☐ Seller at settlement. The parties acknowledge that Listing and/or Selling Brokers and their respective licensees may receive a fee for each home warranty sold.

~~21.  RELATED BUSINESS AND SERVICES:~~ The Listing Broker and Selling Broker may engage in ~~mortgage loan,~~ homeowner's and title insurance, ~~real estate settlement, home warranty and other real~~ estate related businesses and services from which they ~~receive compensation during the course of this transaction,~~ in addition to the real estate ~~brokerage fees.~~

22. PURCHASER DISCLOSURE: Purchaser warrants he/she does not own any real or personal property that must be sold and settled prior to the settlement of this Agreement, except as disclosed in this Agreement.

*23. ADDITIONAL TERMS:

24. STANDARD PROVISIONS:

A. EXPENSE PRORATIONS: Seller agrees to pay the expense of preparing the deed and the applicable grantors tax, release fees, and any other fees applicable to the grantor by custom. Except as otherwise agreed herein, Purchaser shall pay all expenses incurred by Purchaser in connection with this Agreement, including without limitation, title examination fees, title insurance premiums, survey costs, recording costs and Purchaser's attorney's fees.  All taxes, assessments, interest, rent escrow deposits and other ownership fees, if any, shall be prorated as of the date of settlement. In addition to the Purchase Price, Purchaser agrees to pay Seller for all fuel oil and propane/LP gas remaining in any tanks (if applicable) at the prevailing market price as of the date of settlement.

B. TITLE: At settlement Seller shall convey the Property to Purchaser by a general warranty deed containing English covenants of title, free of all encumbrances, tenancies, and liens (for taxes or otherwise), but subject to such restrictive

covenants and utility easements of record which do not materially and adversely affect the use of the Property for residential purposes or render the title unmarketable. If the Property does not abut a public road, title to the Property must include a recorded easement providing adequate access thereto. In the event this sale is subject to a financing contingency under Paragraph 4, the access to a public road must be acceptable to the lender. If the examination reveals a title defect that can be remedied by legal action or otherwise within a reasonable time, Seller, at his/her expense, shall promptly take such action as is necessary to cure such defect. If the defect is not cured within sixty (60) days after Seller receives notice of the defect, then either party may terminate this Agreement at the expiration of such sixty (60) day period by written notice to the other party. Upon termination of this Agreement, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder. The parties agree that the settlement date prescribed in Paragraph 9 shall be extended if necessary to enable Seller to cure any title defect, but not for more than sixty (60) days, time being of the essence.

**C. LAND USE ASSESSMENT:** In the event the Property is taxed under land use assessment and this sale results in disqualification from land use eligibility, Seller shall pay any rollback taxes assessed. If the Property continues to be eligible for land use assessment, Purchaser agrees to make application at Purchaser's expense for continuation under land use, and to pay any rollback taxes resulting from failure to file or to qualify. Notwithstanding anything herein to the contrary, the provisions of this Paragraph C shall survive settlement and the delivery of the deed.

**D. RISK OF LOSS:** All risk of loss or damage to the Property by fire, windstorm, casualty or other cause is assumed by Seller until settlement. In the event of substantial loss or damage to the Property before settlement, Purchaser shall have the option of either (i) terminating this Agreement, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder, or (ii) affirming this Agreement, in which event Seller shall assign to Purchaser all of Seller's rights under any policies of insurance applicable to the Property.

**E. EQUIPMENT CONDITION AND INSPECTION:** Seller shall convey and Purchaser agrees to accept the Property at settlement in its physical condition at the time the Date of Ratification, except as otherwise provided herein. ~~Seller warrants that all appliances, heating and cooling equipment, plumbing systems and electrical systems will be in working order at the time of Settlement or at Purchaser's occupancy, whichever occurs first. Seller agrees to deliver the Property in broom-clean condition and to exercise reasonable and ordinary care in the maintenance and upkeep of the Property between the date this Agreement is executed by Seller and Settlement or at Purchaser's occupancy, whichever occurs first. Seller grants to Purchaser or his representatives the right to make a pre-occupancy or pre-settlement inspection to verify that the condition of the Property conforms to this Agreement and to ensure that repairs, if any, have been completed.~~

**\*F. WELL, SEPTIC OR MUNICIPAL SYSTEMS:**  The Property is served by **[select one]:** ☐ a well  **OR** ☐ municipal water system.  The Property is served by **[select one]:** ☑ a septic system  **OR** ☐ municipal sewage system.  If one or more municipal systems is selected and it is determined prior to settlement by the municipality or a Virginia licensed contractor that the Property is not served by such system(s), then Purchaser shall provide the written determination to Seller.  Purchaser may then terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder.

If the Property is served by a well and/or septic system, Seller agrees to furnish Purchaser with a certificate dated not more than 30 days prior to settlement from a Virginia Department of General Services certified laboratory indicating that the well water is free from contamination by coliform bacteria, and a statement from a septic system contractor indicating there is no evidence of malfunction of the septic system. If Purchaser obtains a VA loan, the well water shall also be tested by Seller and certified as being free from lead contamination.  Inspection of the septic system shall include **[check all applicable boxes]:**

     ☐ visual inspection of drainfield surface with rod probing
     ☐ pump contents and visual inspection of distribution box and all tanks
     ☐ other (describe): _____
     ☐ inspection per manufacturer's guidelines of alternative septic system.

If well water contamination and/or septic system malfunctions are found, Seller shall repair all malfunctions and correct the well contamination at Seller's expense. Subject to the limitation set forth in Paragraph H below, if Seller fails to comply with any provision of this paragraph, then Purchaser may: (i) utilize the remedies set forth in Paragraph 17; (ii) accept the Property in its current condition; or (iii) terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

InstanetFORMS

**\*G. WOOD INFESTATION:** Seller shall furnish Purchaser with an inspection report dated not more than 30 days prior to settlement from a Virginia licensed termite control company concerning the presence of, or damage from, termites or other wood destroying insects. If the inspection reveals active infestation or damage caused by wood destroying insects, whether past or present, to the (i) primary dwelling, (ii) any other dwelling(s) on the Property with a valid certificate of occupancy, and (iii) the following additional structures

_____ Seller shall have the affected area treated and have the damage repaired by a reputable company. The treatment company shall furnish a one-year warranty on such treatment. Subject to the limitation imposed by Paragraph H below, if Seller fails to comply with any provision of this paragraph, Purchaser may: (i) utilize the remedies set forth in Paragraph 17; (ii) accept the Property in its current condition; or (iii) terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

**\*H. LIMITATION:** If the total costs of fulfilling Seller's repair or treatment obligations set forth in Paragraphs F and G above exceeds $ 0.00 ("Repair Limit"), then Seller shall have the option to: (i) fulfill Seller's obligations set forth herein; or (ii) pay or credit the Repair Limit to Purchaser and refuse to pay any excess of the Repair Limit. If Seller elects option (ii), Purchaser shall have the right to either accept the Property in its present condition (in which case the Seller shall pay or credit the Repair Limit to Purchaser at settlement), or to terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder. If no Repair Limit is entered in this paragraph, the parties agree that the amount shall be $1,000.00. The Repair Limit is independent of any obligations agreed to by Seller pursuant to Paragraph 16 or any inspection/repair addendum.

**I. VA/FHA Loans:** If a VA or FHA loan is selected in Paragraph 4, it is expressly agreed that notwithstanding any other provisions of this Agreement, Purchaser shall not be obligated to complete the purchase of the Property or incur any penalty by forfeiture of earnest money deposits or otherwise unless Purchaser has been given in accordance with HUD/FHA or VA requirements a written statement by the Federal Housing Commissioner, Veterans Administration, or a direct endorsement lender setting forth the appraised value of the Property of not less than the Purchase Price. Purchaser shall have the privilege and option of proceeding with consummation of this Agreement without regard to the amount of the appraised value. The appraised value is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value or the condition of the Property. Purchaser should satisfy himself/herself that the price and condition of the Property are acceptable.

**J.  MECHANIC'S LIEN DISCLOSURE:** Virginia law (§43-1 et seq.) permits persons who have performed labor or furnished materials for the construction, removal, repair or improvement of any building or structure to file a lien against the Property. This lien may be filed at any time after the work is commenced or the material is furnished, within 90 days from the last day of the month in which the lienor last performed work or furnished materials or 90 days from the time the construction, removal, repair or improvement is terminated. **An effective lien for work performed prior to the date of settlement may be filed after settlement. Legal counsel should be consulted.** Seller shall deliver to Purchaser at settlement an affidavit in a form acceptable to Purchaser's title company, signed by Seller, that no labor or materials have been furnished to the Property within the statutory period for the filing of mechanics' or materialmens' liens against the Property.  If labor or materials have been furnished to the Property during the statutory period, Seller shall deliver to Purchaser an affidavit signed by Seller and the person(s) furnishing the labor and/or materials that such items have been paid.

**K. NONBINDING MEDIATION:** Unless waived by mutual agreement of the parties, any disputes or claims arising out of this Agreement (except matters involving mechanics liens or licensing) shall be submitted to mediation prior to instituting arbitration or litigation. The cost of mediation will be shared equally between Purchaser and Seller. The mediation shall be non-binding, unless a satisfactory settlement has been reached. Thus, if no settlement is reached, the parties are not bound by the mediation and may pursue any course of action. If a settlement is reached, it shall be binding upon the parties. The mediation shall be provided by a mutually agreeable mediator. Judicial actions to provide provisional remedies, such as an injunction or a lis pendens, shall not be prohibited by the agreement to mediate, nor shall it waive a party's right to mediate.

**L. MISCELLANEOUS:** This Agreement represents the entire agreement between Seller and Purchaser and may not be modified or changed except by written instrument executed by the parties. This Agreement shall be construed according to the laws of the Commonwealth of Virginia and shall be binding upon and shall inure to the benefit of the heirs, personal representatives, successors, and assigns of the parties. To the extent any handwritten or typewritten terms herein conflict with, or are inconsistent with the pre-printed terms hereof, the handwritten or typewritten terms shall control. This Agreement may only be assigned by Purchaser with the written consent of the Seller. If the Seller agrees in writing to an assignment of this Agreement, Purchaser shall remain obligated hereunder until settlement. The parties agree that faxed or electronic transmission of any signed original document shall have the same effect as an original. As used in this

Agreement, a "day" shall mean a calendar day unless otherwise noted. For the purpose of computing time periods, the first day shall be the day following the commencement of a time period. This Agreement may be signed in one or more counterparts, each of which is deemed to be an original and all of which shall together constitute the same instrument. No party will refuse delivery of any notice from the other party in order to hinder or delay any deadline established in this Agreement. **Unless otherwise provided herein, the provisions of this Agreement affecting title shall be deemed merged into the deed delivered at settlement and shall not survive settlement.**

**25. SELLER REPRESENTATION:** Seller warrants each person signing this Agreement as Seller includes all persons possessing an ownership interest in the Property or who will be a necessary party to convey clear title to the Property.

**26. ELECTRONIC SIGNATURES**. In accordance with the Uniform Electronic Transactions Act (UETA) regarding electronic signatures and transactions, the parties do hereby expressly authorize and agree to the use of electronic (such as Authentisign) signatures as an additional method of signing and/or initialing this Agreement.

**\*27. ACCEPTANCE:** This Agreement becomes a legally binding agreement only upon ratification and delivery. Unless ratification and delivery of this Agreement occurs by _____ ☐ a.m. or ☑ p.m. on _____, **this offer shall expire and shall not be binding on either party**. If the parties desire to accept an offer that has expired, then (i) the date set forth in this paragraph 27 must be revised to the ratification date (or later), (ii) each party must initial such revision, and (iii) ratification and delivery must occur prior to the revised expiration date.

As used herein, "ratification and delivery" means delivery of a final accepted and signed Agreement to the other party or their respective broker or salesperson by hand delivery, fax or electronic transmission, or by a professional courier service (including overnight delivery service) or by United States mail with return receipt requested. In the event of a dispute, the sender shall have the burden to demonstrate delivery to the recipient of the final accepted and signed Agreement. "Date of Ratification" means the date upon which ratification and delivery occurs. Purchaser and Seller understand that they shall have the right to withdraw any offer at any time prior to ratification and delivery. If either party withdraws an offer, notice shall be deemed effective upon receipt. If any offer is withdrawn, all deposits shall be returned to the Purchaser at no penalty.

WITNESS the following authorized signatures:

DocuSigned by:

_Katie Burns_                                      2/23/2021

F99FD6D1BDC4472...

| _____ | _____ | Seller HPA Borrower 2016-2 ML LLC    _____ |
| Purchaser  Cicel Johnson | Date | Katie Burns                , Authorized Signer  Date |

| _____ | _____ | _____ | _____ |
| Purchaser | Date | Seller | Date |

| _____ | _____ | _____ | _____ |
| Purchaser | Date | Seller | Date |

*The following is for informational purposes only:*

**Selling Broker Company's Name and Address**          **Listing Company's Name and address**

_____                       _____
_____                       _____
_____                       _____

Office Phone _____                      Office Phone _____
Office Fax _____                      Office Fax _____
DPOR Firm License No.:_____                      DPOR Firm License No.:_____

Purchaser's Authorized Agent's Information:            Seller's Authorized Agent's Information:
Name _____                       Name _____
Email _____                       Email _____
Cell No. _____                      Cell No. _____
Agent's DPOR License No.:_____                      Agent's DPOR License No.: _____

COPYRIGHT©2017 by the Central Virginia Regional MLS, LLC ("CVR MLS"). All rights reserved. This form may be used only by members in good standing of the CVR MLS. The reproduction of this form, in whole or in part, or the use of the names "Central Virginia Regional MLS" or "CVR MLS", in connection with any other form, is prohibited without prior written consent of CVR MLS.

Instanet FORMS

DocuSign Envelope ID: 5955468B-B3F3-4922-8CD0-B94156AFA121

RIDER 1
to Virginia Residential Contract of Purchase
for residential property located at

<u>5105 Claypoint Rd, Chesterfield, VA, 23832</u>                                          ("**Property**")

THIS RIDER 1 ("**Rider**") is made and entered into by and between Purchaser and Seller identified below and is specifically attached to and by this reference made a part of that certain Virginia Residential Contract of Purchase ("**Base Contract**") executed by the same parties in the same capacities, of even date herewith.  All capitalized terms used in this Rider but not otherwise defined herein shall have the same meaning as ascribed thereto in the Base Contract, the Right to Purchase Agreement or the Lease (as applicable and as defined below).  The Base Contract, as amended by this Rider (and any other amendment or rider thereto which shall be executed by Purchaser and Seller), is hereinafter referred to as the "**Contract**" or the "**Purchase Agreement**".

1.  <u>Construction of Contract</u>.  In the event of any conflict between the terms or provisions of this Rider and the terms or provisions of the Base Contract, the terms and provisions of this Rider shall supersede and control. Furthermore, in the event of any conflict between the terms or provisions of the Contract and the terms or provisions of the Lease or Right to Purchase Agreement, then the terms and provisions of the Contract shall supersede and control. The terms of the Contract shall be construed in accordance with their plain meaning. Purchaser acknowledges that it has had the opportunity to consult with its legal counsel regarding the Contract and that accordingly, the terms of the Contract are not to be construed against any party because of that party's role in drafting same or construed in favor of any party because that party failed to understand the legal effect of the provisions thereof.

2.  <u>Condition of Property</u>.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THE CONTRACT OR IN ANY OTHER DOCUMENT EXECUTED BY SELLER PURSUANT TO THE CONTRACT AND TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW: (A) PURCHASER REPRESENTS, WARRANTS AND ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PROPERTY (referred to in the Lease and Right to Purchase Agreement as the "Premises") IN ITS "**AS-IS, WHERE-IS, WITH ALL FAULTS**" CONDITION AS OF THE EFFECTIVE DATE OF THE CONTRACT AND AS OF THE CLOSING DATE AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, HABITABILITY OR ANY OTHER WARRANTY OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER; (B) SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PROPERTY; (C) ONE OR MORE OF THE PERSONS CONSTITUTING PURCHASER, IN ITS CAPACITY AS TENANT UNDER THE RESIDENTIAL LEASE AGREEMENT ("**Lease**") WITH SELLER (OR ITS PREDECESSOR-IN-INTEREST) OF THE PROPERTY, HAS BEEN IN OCCUPANCY OF THE PROPERTY, SHALL BE DEEMED TO BE FULLY AWARE OF THE CONDITION OF THE PROPERTY AND ACKNOWLEDGES THAT IT HAS HAD AMPLE OPPORTUNITY TO INSPECT THE PROPERTY PRIOR TO EXECUTION OF THE CONTRACT; AND (D) PURCHASER ACKNOWLEDGES AND AGREES THAT, TO THE EXTENT THE PROPERTY HAS BEEN DAMAGED PRIOR TO CLOSING, PURCHASER SHALL BE DEEMED TO HAVE CAUSED AND/OR CONSENTED TO SUCH DAMAGE AND TO ACCEPT THE PROPERTY IN ITS DAMAGED CONDITION AS OF CLOSING.

IN FURTHERANCE THEREOF, TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW AND NOTWITHSTANDING ANYTHING CONTAINED IN THE BASE CONTRACT TO THE CONTRARY, SELLER SHALL HAVE NO OBLIGATION UNDER THE CONTRACT TO REPAIR OR RESTORE THE PROPERTY. PURCHASER ACKNOWLEDGES AND AGREES THAT: (I) THE PURCHASE PRICE WAS NEGOTIATED WITH THE EXPRESS UNDERSTANDING THAT PURCHASER IS RESPONSIBLE FOR THE REPAIR AND MAINTENANCE NEEDS OF THE PROPERTY PURSUANT TO THE RIGHT TO PURCHASE AGREEMENT ("**Right to Purchase Agreement**") WITH SELLER (OR ITS PREDECESSOR-IN-INTEREST) FOR THE PROPERTY AND THE CONTRACT; (II) TENANT (WHICH INCLUDES THE PURCHASER) HAS BEEN IN

OCCUPANCY OF THE PROPERTY SINCE THE COMMENCEMENT DATE UNDER THE LEASE AND IS AND WAS IN A UNIQUE POSITION TO INVESTIGATE ALL MATTERS RELATED TO THE CONDITION OF THE PROPERTY; (III) THE CONTRACT IS BEING ENTERED INTO PURSUANT TO THE RIGHT TO PURCHASE AGREEMENT; (IV) TENANT SHALL NOT BE RELIEVED OF OBLIGATIONS ACCRUING UNDER THE LEASE PRIOR TO THE EXPIRATION OR TERMINATION THEREOF; AND (V) UPON CLOSING, PURCHASER SHALL BE DEEMED TO HAVE UNCONDITIONALLY WAIVED AND RELEASED SELLER (BOTH AS SELLER HEREUNDER AND IN ITS CAPACITY AS LANDLORD UNDER THE LEASE) FROM ANY AND ALL OBLIGATIONS SELLER MAY HAVE UNDER THE LEASE OR THE RIGHT TO PURCHASE AGREEMENT TO PERFORM ANY REPAIR OR MAINTENANCE OBLIGATIONS THEREUNDER, IT BEING UNDERSTOOD AND AGREED THAT ALL SUCH OBLIGATIONS THAT REMAIN OUTSTANDING AS OF CLOSING SHALL EXPIRE AND TERMINATE UPON CLOSING; ACCORDINGLY, SELLER SHALL HAVE NO OBLIGATION UNDER THE CONTRACT OR OTHERWISE TO REPAIR OR RESTORE ALL OR ANY PART OF THE PROPERTY AFTER CLOSING.

3.  <u>Purchase Price.</u>  The Purchase Price contained in the Base Contract (a) was determined in accordance with the Right to Purchase Agreement and (b) was based on the initial Closing Date contained in the Base Contract (it being understood and agreed that if the scheduled Closing Date should be delayed and the actual Closing Date would result in an increase in the Purchase Price in accordance with the Right to Purchase Agreement, then the Purchase Price contained in the Contract shall automatically be increased by the same amount). Seller shall have the right to adjust the amount of the Purchase Price and/or the amount of any closing credit contained in the Contract (or any credits contained in the closing disclosure statement): (i) for any matters that were not known or finalized as of the date the Purchase Price contained in the Contract was calculated, (ii) based upon any reductions to the Repair & Maintenance Reserve (including Repair & Maintenance Costs incurred after or not known/finalized as of the Effective Date of the Contract), and (iii) as expressly permitted by the Lease and the Right to Purchase Agreement. For proration and other purposes, Purchaser shall be deemed to own the Property as of the Closing Date.

a.  Prior to closing, Seller shall determine the outstanding balance, if any, of the Repair & Maintenance Reserve and such balance shall either (a) be given to Purchaser as a closing credit or (b) the Purchase Price shall be reduced by such amount.

b.  Purchaser directs Seller that an amount equal to any unapplied Security Deposit and any prepaid Rent then being held by Landlord under the Lease plus the aggregate amount of any pet fees or pet deposits previously paid by Tenant to Landlord under the Lease, in each case subject to permitted setoffs as of Closing, be applied or credited against the Purchase Price (or closing costs or credits) unless otherwise agreed in writing. Seller shall have the right (but will not be required) to require written authorization from all Tenants or Purchase Right Holders confirming such direction. Upon Closing, such amounts so applied toward the Purchase Price will be deemed to have been returned to Tenant pursuant to the terms of the Lease and Landlord will have no further obligation to account for same under the Lease. The earnest money shall be applied to the Purchase Price or closing costs unless otherwise agreed in writing.

c.  Intentionally omitted.

As of the Effective Date of the Contract, Seller confirms that (i) the Security Deposit currently being held by Landlord under the Lease is in the amount of $ 4,100.00   and (ii) Tenant has paid pet fees under the Lease in the aggregate amount of $_____. Such amounts (adjusted as of Closing) shall be identified on the disclosure statement.

It is expressly understood and agreed by Purchaser and Seller that any adjustments to Purchase Price contained in the Contract shall occur, if at all, prior to consummation of the Closing. Once the Closing has occurred, each party hereto waives the right to dispute the calculation of the Purchase Price (including the calculation of the Repair & Maintenance Reserve) paid pursuant to the Contract (including prorations, credits or adjustments shown on the final closing disclosure), all of which shall be final and binding on the parties to the Contract, the Lease and the Right to

Purchase Agreement notwithstanding anything contained therein to the contrary (however Tenant shall not be relieved of any obligations under the Lease accruing prior to the Closing).

4.  <u>Tax-Deferred Exchange</u>.  Purchaser acknowledges that Seller may be entering into the Contract in connection with a tax-deferred exchange (the "**Exchange**") and if requested by Seller, Purchaser shall cooperate with Seller's request to effectuate such Exchange, including executing any documents, instruments or agreements reasonably requested by Seller provided Purchaser shall not be obligated to (i) expend any costs in connection with such Exchange or (ii) accept or assume any additional obligations or liabilities in connection with such Exchange.

5.  <u>Disclosures; No Contingencies or Cancellation Rights</u>.  In addition to the disclosures made pursuant to the terms of the Contract, Purchaser acknowledges and agrees that it is familiar with and has been provided with each of the Disclosures identified in the Lease and the Right to Purchase Agreement and that same shall be deemed to be incorporated into the Contract by this reference without the necessity of attaching same hereto or thereto. Furthermore, before signing the Base Contract and this Rider, Purchaser acknowledges and agrees that it has:

- received, obtained and reviewed and is familiar with all disclosures referenced in Paragraphs 21, 22, 23, 24 and 28 of the Base Contract (as applicable) together with all other specific Disclosures identified in the Lease, the Right to Purchase Agreement and the Base Contract (collectively, the "**Disclosures**", each of which is incorporated into the Contract by this reference without the necessity of attaching same hereto or thereto);

- been provided with an opportunity to conduct a paint inspection or risk assessment for lead-based paint or lead-based paint hazards (unless required by law to be conducted by Landlord or Seller) and it has either completed such inspections and is satisfied with the results thereof or has waived the opportunity to perform such inspections;

- completed all inspections and investigations of the Property as described and suggested in the Base Contract or otherwise desired by Purchaser (collectively, the "**Purchaser Investigations**");

- investigated the value of the Property;

- obtained, reviewed and satisfied itself with respect to any HOA or Association Documents;

- obtained any survey necessary for Purchaser to purchase the Property, if required by Purchaser's lender or if desired by Purchaser; and

- obtained an appraisal for the Property, if required by Purchaser's lender or if desired by Purchaser.

To the extent allowed by Applicable Laws, and irrespective of any language contained in the Base Contract to the contrary, Purchaser and Seller expressly acknowledge and agree that the following are **NOT** contingencies of the Contract:

- reviewing and approving all disclosure documents provided by Seller;
- approving all Disclosures;
- completing and approving all Purchaser Investigations of the Property;
- verifying the condition of the Property;
- obtaining any loan necessary for Purchaser to purchase the Property;
- obtaining, reviewing and satisfying itself with respect to any HOA or Association Documents (including the Association Disclosure Packet);
- obtaining any survey necessary for Purchaser to purchase the Property, if required by Purchaser's lender or if desired by Purchaser; or
- obtaining an appraisal for the Property, if required by Purchaser's lender or if desired by Purchaser.

To the extent the Base Contract specifies otherwise, such provisions are hereby deemed expressly amended by this Rider and **Purchaser expressly acknowledges and agrees that the same shall not constitute contingencies and Purchaser shall have no right to terminate or cancel the Contract due to any such provisions**. Notwithstanding

DocuSign Envelope ID: 5F5468B-B3F3-4922-8CD0-B94156AFA121

the foregoing, this Section 5 is subject to the Appraisal Contingency contained in Section 19 below, if such Section is applicable.

6. <u>Property Owners' Association Disclosure</u>. Purchaser's right to receive the Association Disclosure Packet and the right to cancel the Contract pursuant to the Act (as defined in Paragraph 21 of the Base Contract) are conclusively waived if not exercised prior to the Closing under the Contract.

7. <u>Closing and Possession</u>. Irrespective of any provision contained in the Base Contract to the contrary, Seller will not be obligated to deliver the Property to Purchaser vacant, it being understood and agreed that one or more of the persons who constitute Purchaser has been in possession of the Property pursuant to the terms of the Lease and although the Lease provides that it shall automatically terminate and expire upon the sale of the Property pursuant to the Contract, Purchaser is expressly taking title subject to any holdover by any tenant or occupant under the Lease. Keys and/or means to operate all locks, mailboxes, security systems, alarms and garage door openers have previously been provided to Purchaser and no additional copies will be provided to Purchaser except to the extent in Seller's possession.

8. <u>Survey.</u> Seller shall not be obligated to provide Purchaser with a current survey of the Property but agrees that if it has a copy of a survey in its possession, it will provide a copy thereof to Purchaser. Purchaser acknowledges that should its lender or the title company require a current survey of the Property, obtaining such current survey shall be Purchaser's obligation at Purchaser's sole cost.

9. <u>Title</u>. In addition to the matters set forth in the Base Contract, Purchaser shall take title subject to, and any title insurance policy desired by Purchaser shall contain exceptions or exclusions for, the title company's standard exceptions and exclusions applicable to such form of title insurance policy as well as any matters resulting from any act, omission or acquiescence of Purchaser (or any other "Tenant" or "Occupant" under the Lease) or their respective agents, contractors or subcontractors (or anyone else claiming through Purchaser or such other "Tenant" or any Purchase Right Holder) during the Term of the Lease or any holdover.

10. <u>Condition at Closing</u>. Notwithstanding anything contained in the Base Contract to the contrary, (a) Seller will **not** be obligated to maintain the Property in substantially the same condition as on the Effective Date of the Contract, (b) Purchaser will not have the right to make a final inspection of the Property before Closing and any provisions to the contrary contained in the Base Contract are hereby modified accordingly, and (c) one or more of the persons constituting Purchaser acknowledges that it has been in possession of the Property pursuant to the terms of the Lease. Nothing contained in the Contract or in the Lease shall relieve Tenant from liability under the Lease with respect to damage or a casualty occurring on or before the Expiration Date of the Lease.

11. <u>Broker</u>. Purchaser represents to Seller that no broker was used in connection with the Contract and no commissions, fees or other compensation shall be payable or owed to a broker as a result of the sale of the Property to Purchaser (except for any broker retained by Seller in which event Seller shall be responsible for any commission due such broker) and Purchaser shall indemnify Seller against a breach of such representation. This provision shall survive the Closing or termination of the Contract indefinitely. All references to "Broker" contained in the Base Contract are hereby deleted.

12. <u>Legal Fees</u>. In the event Seller or Purchaser institutes any action or proceeding against the other relating to the provisions of the Base Contract, the party not prevailing in the action or proceeding will reimburse the prevailing party for its reasonable attorneys' fees (not to exceed $1,000 in any such action inclusive of costs and expenses) incurred in connection with such action or proceeding. The term "prevailing party" shall include, without limitation, a party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense.

13. <u>Time is of Essence</u>. The parties agree that time is of the essence for the performance of each and every covenant, term, agreement and condition contained in the Contract (including but not limited to delivery of notices and payment obligations).

14. <u>RESPA</u>. Purchaser and Seller agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974. In the event that either party shall fail to make appropriate disclosure when asked, such failure shall be considered a breach on the part of said party.

15. <u>Non-Terrorist</u>. Purchaser certifies that he/she/it has not been designated or named as a terrorist, a "Specially Designated National and Blocked Person," or any other banned or blocked individual or entity pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website. Purchaser shall defend, indemnify, and hold harmless Seller from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any current or future breach of the foregoing certification.

16. <u>Notices</u>. Notices may be given by a party's attorney.

17. <u>Insurance</u>. Seller shall terminate and cancel all hazard and other insurance held by it in connection with the Property as of the Closing Escrow. Purchaser shall obtain new insurance policies at the Closing, to the extent desired by Purchaser or required by Purchaser's lender.

18. <u>Contract Binding on Successors; No Purchaser Right to Assign; Joint and Several; Miscellaneous.</u> The Contract shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors, heirs and permitted assigns, it being understood and agreed that Purchaser shall not have the right to assign the Contract nor any rights or interests therein (the inclusion of "and/or successors or assigns" or similar language in the Right to Purchase Agreement or the Contract shall not constitute Seller's written consent to any names beyond those permitted by the Right to Purchase Agreement). Each person constituting Purchaser (should there be more than one) is and shall be jointly and severally liable for all obligations of Purchaser under the Contract. This Rider may be executed in one or more counterparts, each of which shall be deemed an original. Furthermore, executed counterparts of this Rider and any amendment hereto or to the Contract may be delivered by facsimile or other reliable electronic means (including emails of pdf/tif documents), and such facsimile or other electronic transmission shall be valid and binding for all purposes when transmitted to and actually received by the other party; however, each party delivering executed documents by facsimile or other electronic means agrees to provide the other party with an original, hard copy of the relevant signed documents promptly after the request of the other party. The Contract constitutes the complete and entire agreement among the parties pertaining to the sale of the Property, and no representations or oral statements of either party are binding unless contained herein (except to the extent expressly contained in the Lease or the Right to Purchase Agreement). The Contract may not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto. Neither Seller nor any of its agents has made any oral promises, representations, or agreements not contained in the Contract and no agent of Seller has any authority to waive, amend, or terminate the Contract or any part of it, and no authority to make promises, representations, or agreements that impose duties or other obligations on Seller or waives any obligation of Purchaser hereunder.

19. ☒ ⬩⬩ _____ (**This Section is applicable (a) only if checked and initialed by Seller and (b) for the <u>first</u> Executed Purchase Contract associated with the Right to Purchase Agreement and there shall be no Appraisal Contingency thereafter).**

<u>Appraisal Contingency</u>. Purchaser shall have the right to terminate the Contract in the event an Appraisal (defined below) obtained by Purchaser certifies an appraised value for the Property that is less than the Purchase Price ("**Appraisal Contingency**"). For purposes hereof, the "**Appraisal**" must be in writing, prepared and signed by a licensed real estate appraiser in the state in which the Property is located and must be dated no earlier than the Effective Date of the Contract and no later than the scheduled Closing Date contained in the Contract (as same may be extended in writing). In order to terminate the Contract due to an Appraisal Contingency, Purchaser must provide Seller, prior to the scheduled Closing Date, with a written notice of such termination together with a copy of the Appraisal satisfying the foregoing requirements. Promptly after such termination due to an Appraisal Contingency, the earnest money (minus any out-of-pocket costs incurred by Seller in connection with preparing for the Closing such as ordering a title commitment or obtaining a pay-off letter, which amounts shall be retained by Seller) shall be promptly refunded to Purchaser.

**IN WITNESS WHEREOF**, the undersigned have executed this Rider 1 as of the date set forth in the Base Contract to which it is attached ("**Effective Date**").

**PURCHASER:**

_____
Name:  Cicel Johnson

_____
Name:

_____
Name:

_____
Name:

Purchaser's Address (if different from the Property)

_____

**SELLER:**

HPA Borrower 2016-2 ML LLC                        ,
a Delaware limited liability company

By:_____
Name: Katie Burns
Title:  Authorized Agent

Seller's Address:

120 S. Riverside Plaza, Suite 2000, Chicago, IL 60606

RIDER 2
to Virginia Residential Contract of Purchase
for residential property located at

5105 Claypoint Rd, Chesterfield, VA, 23832 _____ ("**Property**")

THIS RIDER 2 ("**Rider**") is made and entered into by and between Buyer and Seller identified below and is specifically attached to that certain [Virginia Residential Contract of Purchase] ("**Base Contract**") executed by the same parties in the same capacities, of even date herewith. All capitalized terms used in this Rider but not otherwise defined herein shall have the same meaning as ascribed thereto in the Base Contract, the Right to Purchase Agreement or the Lease (as applicable and as defined below). The Base Contract, as amended by this Rider (and any other amendment or rider thereto which shall be executed by Buyer and Seller), is hereinafter referred to as the "**Contract**".

1.  Construction of Contract. In the event of any conflict between the terms or provisions of this Rider and the terms or provisions of the Base Contract, the terms and provisions of this Rider shall supersede and control. The terms of the Contract shall be construed in accordance with their plain meaning. Buyer acknowledges that it has had the opportunity to consult with its legal counsel regarding the Contract and that accordingly, the terms of the Contract are not to be construed against any party because of that party's role in drafting same or construed in favor of any party because that party failed to understand the legal effect of the provisions thereof. All terms and provisions of the Contract are expressly subject and subordinate to the terms of the Right to Purchase Agreement, and the terms and provisions of the Right to Purchase Agreement shall control over any conflict.

2.  Closing and Settlement Statements. Buyer hereby authorizes the title company or attorney or other agent performing an equivalent function, as the case may be, to provide Seller with a copy of any and all title and settlement documents and related information, including without limitation information that may contain Buyer's nonpublic personal information related to Buyer's home loan financing, for Seller's recordkeeping and other business purposes. Such information shall be maintained and used by Seller in accordance with Seller's privacy policy, which is available at: https://www.homepartners.com/policy/privacy

3.  Miscellaneous. This Rider may be executed in one or more counterparts, each of which shall be deemed an original. Furthermore, executed counterparts of this Rider and any amendment hereto or to the Contract may be delivered by facsimile or other reliable electronic means (including emails of pdf/tif documents), and such facsimile or other electronic transmission shall be valid and binding for all purposes when transmitted to and actually received by the other party, however, each party delivering executed documents by facsimile or other electronic means agrees to provide the other party with an original, hard copy of the relevant signed documents promptly after the request of the other party. The Contract constitutes the complete and entire agreement among the parties pertaining to the sale of the Property, and no representations or oral statements of either party are binding unless contained herein (except to the extent expressly contained in the Lease or the Right to Purchase Agreement). The Contract may not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto. Neither Seller nor any of its agents has made any oral promises, representations, or agreements not contained in the Contract and no agent of Seller has any authority to waive, amend, or terminate the Contract or any part of it, and no authority to make promises, representations, or agreements that impose duties or other obligations on Seller or waives any obligation of Buyer hereunder.

**IN WITNESS WHEREOF**, the undersigned have executed this Rider 2 as of the date set forth in the Base Contract to which it is attached.

Buyer _____    Address: 5105 Claypoint Rd, Chesterfield, VA, 23832
    Name: Cicel Johnson

Buyer _____    Address: 5105 Claypoint Rd, Chesterfield, VA, 23832
    Name:

Buyer _____    Address: 5105 Claypoint Rd, Chesterfield, VA, 23832
    Name:

Buyer _____    Address: 5105 Claypoint Rd, Chesterfield, VA, 23832
    Name:

1

**Seller:**

HPA Borrower 2016-2 ML LLC _____ , a Delaware limited liability company

By: _____

Name: Katie Burns

Title:  Authorized Agent

Address: 120 S. Riverside Plaza, Suite 2000, Chicago, IL 60606



**Virginia Real Estate Board**

http://www.dpor.virginia.gov/Consumers/Disclosure_Forms/

# RESIDENTIAL PROPERTY DISCLOSURE STATEMENT
## ACKNOWLEDGEMENT BY SELLER AND PURCHASER

The Virginia Residential Property Disclosure Act (§ 55.1-700 et seq. of the *Code of Virginia*) requires the owner of certain residential real property—whenever the property is to be sold or leased with an option to buy—to provide notification to the purchaser of any disclosures required by the Act and to refer the purchaser to the Real Estate Board website referenced below for additional information.

Certain transfers of residential property are excluded from this requirement (see § 55.1-702).

**PROPERTY ADDRESS/
LEGAL DESCRIPTION:**   5105 Claypoint Rd, Chesterfield, VA, 23832

The purchaser is advised to consult the RESIDENTIAL PROPERTY DISCLOSURE STATEMENT webpage (http://www.dpor.virginia.gov/Consumers/Residential_Property_Disclosures) for important information about disclosures required by law that may affect the buyer's decision to purchase the real property described above.

**The owner(s) hereby provides notification** as required under the Virginia Residential Property Disclosure Act (§ 55.1-700 et seq. of the *Code of Virginia*) and, if represented by a real estate licensee as provided in § 55.1-712, further acknowledges having been informed of the rights and obligations under the Act.

*Katie Burns*

—————————————————————
Owner  HPA Borrower 2016-2 ML LLC
       Katie Burns                    , Authorized Signer

2/19/2021
——————————
Date

—————————————————————
Owner

——————————
Date

**The purchaser(s) hereby acknowledges receipt of notification** of disclosures as required under the Virginia Residential Property Disclosure Act (§ 55.1-700 et seq. of the *Code of Virginia*). In addition, if the purchaser is (i) represented by a real estate licensee or (ii) not represented by a real estate licensee but the owner is so represented as provided in § 55.1-712, the purchaser further acknowledges having been informed of the rights and obligations under the Act.

—————————————————————
Purchaser  Cicel Johnson

——————————
Date

—————————————————————
Purchaser

——————————
Date

DPOR rev 10/01/19

DocuSign Envelope ID: 15F5463B-B3E3-4922-8CD0-B94F56AFA421

Commonwealth of Virginia
Department of Professional and Occupational Regulation
9960 Mayland Drive, Suite 400
Richmond, Virginia 23233-1485
(804) 367-8595
www.dpor.virginia.gov



**Board for Asbestos, Lead and Home Inspectors**
**VIRGINIA LEAD LICENSING CONSUMER INFORMATION SHEET**

Pursuant to 18VAC15-30-510 of the *Virginia Lead-Based Paint Activities Regulations* the following situations and relationships between license categories are considered a conflict of interest and are prohibited:

It is a conflict of interest for a *lead abatement contractor* to enter into a contract to perform a lead abatement project if the *lead inspection* or *project design* is to be performed by individuals with an employer/employee relationship with, or financial interest in, the lead abatement contractor, unless the contractor provides the building owner with the Virginia Lead Licensing Consumer Information Sheet and a Virginia Lead Licensing **Inspector/Risk Assessor/Project Designer/Contractor Disclosure Form**. Any employer/employee or financial interest relationships must be disclosed and the disclosure form must be signed and dated by the building owner, or his agent, and the contracting entity prior to the signing of any contract to conduct lead-based paint activities. The contractor shall provide the disclosure form to all parties involved in the lead abatement project. The disclosure form shall be kept on the lead abatement project site and available to review.

Persons licensed to perform post-abatement clearance procedures shall be independent of and have no financial interest in or an employer/employee relationship with the licensed *lead abatement contractor*.

Before signing any contract, you should ask to see the Virginia Lead Abatement Contractor, Worker, Supervisor, Inspector, Risk Assessor, or Project Designer license to verify that it has not expired and that the licensee is working within the limits of his license and training requirements. **No Individual or Company May Work With An Expired License!** *There is no grace period on an expired license*.

The Board for Asbestos, Lead, and Home Inspectors does not have the authority to order a licensee to make restitution to you for losses you may incur due to poor performance by the licensee. Efforts to recover such funds must be litigated in the civil courts. You should carefully review the contract before signing it to ensure that the terms of agreement are clear and acceptable to you. As the building owner and originator of the lead-based paint hazard, you can be found liable if the licensee does not adhere to all federal, state, and local laws and regulations.

Should you have a reason to believe that a lead licensee may not have complied with all federal, state, and local laws and regulations, you should notify the Department of Professional and Occupational Regulation by calling (804) 367-8595 or writing to the *Executive Director, Virginia Board for Asbestos, Lead, and Home Inspectors, Department of Professional and Occupational Regulation,* 9960 Mayland Drive, Suite 400, Richmond, Virginia 23233-1485.

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121







# Protect Your Family From Lead in Your Home



United States
Environmental
Protection Agency



United States
Consumer Product
Safety Commission



United States
Department of Housing
and Urban Development

September 2013

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Are You Planning to Buy or Rent a Home Built Before 1978?

Did you know that many homes built before 1978 have **lead-based paint**? Lead from paint, chips, and dust can pose serious health hazards.

**Read this entire brochure to learn:**

- How lead gets into the body
- About health effects of lead
- What you can do to protect your family
- Where to go for more information

**Before renting or buying a pre-1978 home or apartment, federal law requires:**

- Sellers must disclose known information on lead-based paint or lead-based paint hazards before selling a house.
- Real estate sales contracts must include a specific warning statement about lead-based paint. Buyers have up to 10 days to check for lead.
- Landlords must disclose known information on lead-based paint and lead-based paint hazards before leases take effect. Leases must include a specific warning statement about lead-based paint.

**If undertaking renovations, repairs, or painting (RRP) projects in your pre-1978 home or apartment:**

- Read EPA's pamphlet, *The Lead-Safe Certified Guide to Renovate Right,* to learn about the lead-safe work practices that contractors are required to follow when working in your home (see page 12).



DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

# Simple Steps to Protect Your Family
# from Lead Hazards

**If you think your home has lead-based paint:**

• Don't try to remove lead-based paint yourself.

• Always keep painted surfaces in good condition to minimize deterioration.

• Get your home checked for lead hazards. Find a certified inspector or risk assessor at epa.gov/lead.

• Talk to your landlord about fixing surfaces with peeling or chipping paint.

• Regularly clean floors, window sills, and other surfaces.

• Take precautions to avoid exposure to lead dust when remodeling.

• When renovating, repairing, or painting, hire only EPA- or state-approved Lead-Safe certified renovation firms.

• Before buying, renting, or renovating your home, have it checked for lead-based paint.

• Consult your health care provider about testing your children for lead. Your pediatrician can check for lead with a simple blood test.

• Wash children's hands, bottles, pacifiers, and toys often.

• Make sure children avoid fatty (or high fat) foods and eat nutritious meals high in iron and calcium.

• Remove shoes or wipe soil off shoes before entering your house.

1

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Lead Gets into the Body in Many Ways

**Adults and children can get lead into their bodies if they:**

- Breathe in lead dust (especially during activities such as renovations, repairs, or painting that disturb painted surfaces).

- Swallow lead dust that has settled on food, food preparation surfaces, and other places.

- Eat paint chips or soil that contains lead.

**Lead is especially dangerous to children under the age of 6.**

- At this age, children's brains and nervous systems are more sensitive to the damaging effects of lead.



- Children's growing bodies absorb more lead.

- Babies and young children often put their hands and other objects in their mouths. These objects can have lead dust on them.

**Women of childbearing age should know that lead is dangerous to a developing fetus.**

- Women with a high lead level in their system before or during pregnancy risk exposing the fetus to lead through the placenta during fetal development.

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Health Effects of Lead

**Lead affects the body in many ways.**  It is important to know that even exposure to low levels of lead can severely harm children.

**In children, exposure to lead can cause:**



- Nervous system and kidney damage

- Learning disabilities, attention deficit disorder, and decreased intelligence

- Speech, language, and behavior problems

- Poor muscle coordination

- Decreased muscle and bone growth

- Hearing damage

While low-lead exposure is most common, exposure to high amounts of lead can have devastating effects on children, including seizures, unconsciousness, and, in some cases, death.

Although children are especially susceptible to lead exposure, lead can be dangerous for adults, too.

**In adults, exposure to lead can cause:**

- Harm to a developing fetus

- Increased chance of high blood pressure during pregnancy

- Fertility problems (in men and women)

- High blood pressure

- Digestive problems

- Nerve disorders

- Memory and concentration problems

- Muscle and joint pain

3

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Check Your Family for Lead

**Get your children and home tested if you think your home has lead.**

Children's blood lead levels tend to increase rapidly from 6 to 12 months of age, and tend to peak at 18 to 24 months of age.

Consult your doctor for advice on testing your children. A simple blood test can detect lead. Blood lead tests are usually recommended for:

- Children at ages 1 and 2

- Children or other family members who have been exposed to high levels of lead

- Children who should be tested under your state or local health screening plan

**Your doctor can explain what the test results mean and if more testing will be needed.**

4

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Where Lead-Based Paint Is Found

In general, the older your home or childcare facility, the more likely it has lead-based paint.[1]

**Many homes, including private, federally-assisted, federally-owned housing, and childcare facilities built before 1978 have lead-based paint.** In 1978, the federal government banned consumer uses of lead-containing paint.[2]

Learn how to determine if paint is lead-based paint on page 7.

**Lead can be found:**

- In homes and childcare facilities in the city, country, or suburbs,

- In private and public single-family homes and apartments,

- On surfaces inside and outside of the house, and

- In soil around a home. (Soil can pick up lead from exterior paint or other sources, such as past use of leaded gas in cars.)

Learn more about where lead is found at epa.gov/lead.

---

[1] "Lead-based paint" is currently defined by the federal government as paint with lead levels greater than or equal to 1.0 milligram per square centimeter (mg/cm), or more than 0.5% by weight.

[2] "Lead-containing paint" is currently defined by the federal government as lead in new dried paint in excess of 90 parts per million (ppm) by weight.

5

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Identifying Lead-Based Paint and Lead-Based Paint Hazards

**Deteriorating lead-based paint (peeling, chipping, chalking, cracking, or damaged paint)** is a hazard and needs immediate attention. **Lead-based paint** may also be a hazard when found on surfaces that children can chew or that get a lot of wear and tear, such as:

- On windows and window sills

- Doors and door frames

- Stairs, railings, banisters, and porches

**Lead-based paint is usually not a hazard if it is in good condition** and if it is not on an impact or friction surface like a window.

**Lead dust** can form when lead-based paint is scraped, sanded, or heated. Lead dust also forms when painted surfaces containing lead bump or rub together. Lead paint chips and dust can get on surfaces and objects that people touch. Settled lead dust can reenter the air when the home is vacuumed or swept, or when people walk through it. EPA currently defines the following levels of lead in dust as hazardous:

- 40 micrograms per square foot ($\mu$g/ft$^2$) and higher for floors, including carpeted floors

- 250 $\mu$g/ft$^2$ and higher for interior window sills

**Lead in soil** can be a hazard when children play in bare soil or when people bring soil into the house on their shoes. EPA currently defines the following levels of lead in soil as hazardous:

- 400 parts per million (ppm) and higher in play areas of bare soil

- 1,200 ppm (average) and higher in bare soil in the remainder of the yard

**Remember, lead from paint chips—which you can see—and lead dust—which you may not be able to see—both can be hazards.**

The only way to find out if paint, dust, or soil lead hazards exist is to test for them. The next page describes how to do this.

6

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Checking Your Home for Lead

You can get your home tested for lead in several different ways:

- A lead-based paint **inspection** tells you if your home has lead-based paint and where it is located. It won't tell you whether your home currently has lead hazards. A trained and certified testing professional, called a lead-based paint inspector, will conduct a paint inspection using methods, such as:

  - Portable x-ray fluorescence (XRF) machine

  - Lab tests of paint samples

- A **risk assessment** tells you if your home currently has any lead hazards from lead in paint, dust, or soil. It also tells you what actions to take to address any hazards. A trained and certified testing professional, called a risk assessor, will:

  - Sample paint that is deteriorated on doors, windows, floors, stairs, and walls

  - Sample dust near painted surfaces and sample bare soil in the yard

  - Get lab tests of paint, dust, and soil samples

- A combination inspection and risk assessment tells you if your home has any lead-based paint and if your home has any lead hazards, and where both are located.

Be sure to read the report provided to you after your inspection or risk assessment is completed, and ask questions about anything you do not understand.

7

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Checking Your Home for Lead, continued

In preparing for renovation, repair, or painting work in a pre-1978 home, Lead-Safe Certified renovators (see page 12) may:

- Take paint chip samples to determine if lead-based paint is present in the area planned for renovation and send them to an EPA-recognized lead lab for analysis. In housing receiving federal assistance, the person collecting these samples must be a certified lead-based paint inspector or risk assessor

- Use EPA-recognized tests kits to determine if lead-based paint is absent (but not in housing receiving federal assistance)

- Presume that lead-based paint is present and use lead-safe work practices

There are state and federal programs in place to ensure that testing is done safely, reliably, and effectively. Contact your state or local agency for more information, visit epa.gov/lead, or call **1-800-424-LEAD (5323)** for a list of contacts in your area.[3]

---

[3]  Hearing- or speech-challenged individuals may access this number through TTY by calling the Federal Relay Service at 1-800-877-8399.

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## What You Can Do Now to Protect Your Family

**If you suspect that your house has lead-based paint hazards, you can take some immediate steps to reduce your family's risk:**

• If you rent, notify your landlord of peeling or chipping paint.

• Keep painted surfaces clean and free of dust. Clean floors, window frames, window sills, and other surfaces weekly. Use a mop or sponge with warm water and a general all-purpose cleaner. (Remember: never mix ammonia and bleach products together because they can form a dangerous gas.)

• Carefully clean up paint chips immediately without creating dust.

• Thoroughly rinse sponges and mop heads often during cleaning of dirty or dusty areas, and again afterward.

• Wash your hands and your children's hands often, especially before they eat and before nap time and bed time.

• Keep play areas clean. Wash bottles, pacifiers, toys, and stuffed animals regularly.

• Keep children from chewing window sills or other painted surfaces, or eating soil.

• When renovating, repairing, or painting, hire only EPA- or state-approved Lead-Safe Certified renovation firms (see page 12).

• Clean or remove shoes before entering your home to avoid tracking in lead from soil.

• Make sure children avoid fatty (or high fat) foods and eat nutritious meals high in iron and calcium. Children with good diets absorb less lead.

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Reducing Lead Hazards

**Disturbing lead-based paint or removing lead improperly can increase the hazard to your family by spreading even more lead dust around the house.**



- In addition to day-to-day cleaning and good nutrition, you can **temporarily** reduce lead-based paint hazards by taking actions, such as repairing damaged painted surfaces and planting grass to cover lead-contaminated soil. These actions are not permanent solutions and will need ongoing attention.

- You can minimize exposure to lead when renovating, repairing, or painting by hiring an EPA- or state-certified renovator who is trained in the use of lead-safe work practices. If you are a do-it-yourselfer, learn how to use lead–safe work practices in your home.

- To remove lead hazards permanently, you should hire a certified lead abatement contractor. Abatement (or permanent hazard elimination) methods include removing, sealing, or enclosing lead-based paint with special materials. Just painting over the hazard with regular paint is not permanent control.

**Always use a certified contractor who is trained to address lead hazards safely.**

- Hire a Lead-Safe Certified firm (see page 12) to perform renovation, repair, or painting (RRP) projects that disturb painted surfaces.

- To correct lead hazards permanently, hire a certified lead abatement professional. This will ensure your contractor knows how to work safely and has the proper equipment to clean up thoroughly.

Certified contractors will employ qualified workers and follow strict safety rules as set by their state or by the federal government.

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Reducing Lead Hazards, continued

**If your home has had lead abatement work done** or if the housing is receiving federal assistance, once the work is completed, dust cleanup activities must be conducted until clearance testing indicates that lead dust levels are below the following levels:

- 40 micrograms per square foot ($\mu g/ft^2$) for floors, including carpeted floors

- 250 $\mu g/ft^2$ for interior windows sills

- 400 $\mu g/ft^2$ for window troughs

For help in locating certified lead abatement professionals in your area, call your state or local agency (see pages 14 and 15), or visit epa.gov/lead, or call 1-800-424-LEAD.

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Renovating, Remodeling, or Repairing (RRP) a Home with Lead-Based Paint

**If you hire a contractor to conduct renovation, repair, or painting (RRP) projects in your pre-1978 home or childcare facility (such as pre-school and kindergarten), your contractor must:**



- Be a Lead-Safe Certified firm approved by EPA or an EPA-authorized state program

- Use qualified trained individuals (Lead-Safe Certified renovators) who follow specific lead-safe work practices to prevent lead contamination

- Provide a copy of EPA's lead hazard information document, *The Lead-Safe Certified Guide to Renovate Right*

**RRP contractors working in pre-1978 homes and childcare facilities must follow lead-safe work practices that:**

- **Contain the work area.** The area must be contained so that dust and debris do not escape from the work area. Warning signs must be put up, and plastic or other impermeable material and tape must be used.

- **Avoid renovation methods that generate large amounts of lead-contaminated dust.** Some methods generate so much lead-contaminated dust that their use is prohibited. They are:

    - Open-flame burning or torching

    - Sanding, grinding, planing, needle gunning, or blasting with power tools and equipment not equipped with a shroud and HEPA vacuum attachment and

    - Using a heat gun at temperatures greater than 1100°F

- **Clean up thoroughly.** The work area should be cleaned up daily. When all the work is done, the area must be cleaned up using special cleaning methods.

- **Dispose of waste properly.** Collect and seal waste in a heavy duty bag or sheeting. When transported, ensure that waste is contained to prevent release of dust and debris.

To learn more about EPA's requirements for RRP projects visit epa.gov/getleadsafe, or read *The Lead-Safe Certified Guide to Renovate Right*.

12

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Other Sources of Lead

**While paint, dust, and soil are the most common sources of lead, other lead sources also exist:**

- **Drinking water.** Your home might have plumbing with lead or lead solder. You cannot see, smell, or taste lead, and boiling your water will not get rid of lead. If you think your plumbing might contain lead:

  - Use only cold water for drinking and cooking.

  - Run water for 15 to 30 seconds before drinking it, especially if you have not used your water for a few hours.

  Call your local health department or water supplier to find out about testing your water, or visit epa.gov/lead for EPA's lead in drinking water information.

- **Lead smelters** or other industries that release lead into the air.

- **Your job.** If you work with lead, you could bring it home on your body or clothes. Shower and change clothes before coming home. Launder your work clothes separately from the rest of your family's clothes.

- **Hobbies** that use lead, such as making pottery or stained glass, or refinishing furniture. Call your local health department for information about hobbies that may use lead.

- Old **toys** and **furniture** may have been painted with lead-containing paint. Older toys and other children's products may have parts that contain lead.[4]

- Food and liquids cooked or stored in **lead crystal** or **lead-glazed pottery or porcelain** may contain lead.

- Folk remedies, such as **"greta"** and **"azarcon,"** used to treat an upset stomach.

---

[4] In 1978, the federal government banned toys, other children's products, and furniture with lead-containing paint (16 CFR 1303). In 2008, the federal government banned lead in most children's products. The federal government currently bans lead in excess of 100 ppm by weight in most children's products (76 FR 44463).

13

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## For More Information

**The National Lead Information Center**
Learn how to protect children from lead poisoning and get other information about lead hazards on the Web at epa.gov/lead and hud.gov/lead, or call **1-800-424-LEAD (5323).**

**EPA's Safe Drinking Water Hotline**
For information about lead in drinking water, call **1-800-426-4791**, or visit epa.gov/lead for information about lead in drinking water.

**Consumer Product Safety Commission (CPSC) Hotline**
For information on lead in toys and other consumer products, or to report an unsafe consumer product or a product-related injury, call **1-800-638-2772,** or visit CPSC's website at cpsc.gov or saferproducts.gov.

**State and Local Health and Environmental Agencies**
Some states, tribes, and cities have their own rules related to lead-based paint. Check with your local agency to see which laws apply to you. Most agencies can also provide information on finding a lead abatement firm in your area, and on possible sources of financial aid for reducing lead hazards. Receive up-to-date address and phone information for your state or local contacts on the Web at epa.gov/lead, or contact the National Lead Information Center at **1-800-424-LEAD.**

> Hearing- or speech-challenged individuals may access any of the phone numbers in this brochure through TTY by calling the toll-free Federal Relay Service at **1-800-877-8339**.

14

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## U. S. Environmental Protection Agency (EPA) Regional Offices

The mission of EPA is to protect human health and the environment. Your Regional EPA Office can provide further information regarding regulations and lead protection programs.

**Region 1** (Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)

Regional Lead Contact
U.S. EPA Region 1
5 Post Office Square, Suite 100, OES 05-4
Boston, MA 02109-3912
(888) 372-7341

**Region 2** (New Jersey, New York, Puerto Rico, Virgin Islands)

Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 205, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 3** (Delaware, Maryland, Pennsylvania, Virginia, DC, West Virginia)

Regional Lead Contact
U.S. EPA Region 3
1650 Arch Street
Philadelphia, PA 19103
(215) 814-2088

**Region 4** (Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)

Regional Lead Contact
U.S. EPA Region 4
AFC Tower, 12th Floor, Air, Pesticides & Toxics
61 Forsyth Street, SW
Atlanta, GA 30303
(404) 562-8998

**Region 5** (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)

Regional Lead Contact
U.S. EPA Region 5 (DT-8J)
77 West Jackson Boulevard
Chicago, IL 60604-3666
(312) 886-7836

**Region 6** (Arkansas, Louisiana, New Mexico, Oklahoma, Texas, and 66 Tribes)

Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue, 12th Floor
Dallas, TX 75202-2733
(214) 665-2704

**Region 7** (Iowa, Kansas, Missouri, Nebraska)

Regional Lead Contact
U.S. EPA Region 7
11201 Renner Blvd.
WWPD/TOPE
Lenexa, KS 66219
(800) 223-0425

**Region 8** (Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)

Regional Lead Contact
U.S. EPA Region 8
1595 Wynkoop St.
Denver, CO 80202
(303) 312-6966

**Region 9** (Arizona, California, Hawaii, Nevada)

Regional Lead Contact
U.S. EPA Region 9 (CMD-4-2)
75 Hawthorne Street
San Francisco, CA 94105
(415) 947-4280

**Region 10** (Alaska, Idaho, Oregon, Washington)

Regional Lead Contact
U.S. EPA Region 10
Solid Waste & Toxics Unit (WCM-128)
1200 Sixth Avenue, Suite 900
Seattle, WA 98101
(206) 553-1200

15

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

## Consumer Product Safety Commission (CPSC)

The CPSC protects the public against unreasonable risk of injury from consumer products through education, safety standards activities, and enforcement. Contact CPSC for further information regarding consumer product safety and regulations.

**CPSC**

4330 East West Highway
Bethesda, MD 20814-4421
1-800-638-2772
cpsc.gov or saferproducts.gov

## U. S. Department of Housing and Urban Development (HUD)

HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. Contact HUD's Office of Healthy Homes and Lead Hazard Control for further information regarding the Lead Safe Housing Rule, which protects families in pre-1978 assisted housing, and for the lead hazard control and research grant programs.

**HUD**

451 Seventh Street, SW, Room 8236
Washington, DC 20410-3000
(202) 402-7698
hud.gov/offices/lead/

This document is in the public domain. It may be produced by an individual or organization without permission. Information provided in this booklet is based upon current scientific and technical understanding of the issues presented and is reflective of the jurisdictional boundaries established by the statutes governing the co-authoring agencies. Following the advice given will not necessarily provide complete protection in all situations or against all health hazards that can be caused by lead exposure.

U. S. EPA Washington DC 20460                          EPA-747-K-12-001
U. S. CPSC Bethesda MD 20814                          September 2013
U. S. HUD Washington DC 20410

DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

# IMPORTANT!

## Lead From Paint, Dust, and Soil in and Around Your Home Can Be Dangerous if Not Managed Properly

- Children under 6 years old are most at risk for lead poisoning in your home.

- Lead exposure can harm young children and babies even before they are born.

- Homes, schools, and child care facilities built before 1978 are likely to contain lead-based paint.

- Even children who seem healthy may have dangerous levels of lead in their bodies.

- Disturbing surfaces with lead-based paint or removing lead-based paint improperly can increase the danger to your family.

- People can get lead into their bodies by breathing or swallowing lead dust, or by eating soil or paint chips containing lead.

- People have many options for reducing lead hazards. Generally, lead-based paint that is in good condition is not a hazard (see page 10).



**EPA**
United States
Environmental Protection
Agency





CDC
CENTERS FOR DISEASE CONTROL

# A Citizen's Guide To Radon

## The Guide To Protecting Yourself And Your Family From Radon



# *EPA Recommends:*

▼ **Test your home for radon—it's easy and inexpensive.**

▼ **Fix your home if your radon level is 4 picocuries per liter (pCi/L) or higher.**

▼ **Radon levels less than 4 pCi/L still pose a risk, and in many cases may be reduced.**

*Radon is estimated to cause thousands of lung cancer deaths in the U.S. each year.*



*\*Radon is estimated to cause about 21,000 lung cancer deaths per year, according to EPA's 2003 Assessment of Risks from Radon in Homes (EPA 402-R-03-003).  The numbers of deaths from other causes are taken from the Centers for Disease Control and Prevention's 1999-2001 National Center for Injury Prevention and Control Report and 2002 National Safety Council Reports.*

DocuSign Envelope ID: 5AF5463B-B3F3-4922-8CD0-B84F56AFA421

# OVERVIEW

## Radon is a cancer-causing, radioactive gas.

You can't see radon.  And you can't smell it or taste it.  But it may be a problem in your home.

Radon is estimated to cause many thousands of deaths each year.  That's because when you breathe air containing radon, you can get lung cancer.  In fact, the Surgeon General has warned that radon is the second leading cause of lung cancer in the United States today.  Only smoking causes more lung cancer deaths. **If you smoke and your home has high radon levels, your risk of lung cancer is especially high.**

## Radon can be found all over the U.S.

Radon comes from the natural (radioactive) breakdown of uranium in soil, rock and water and gets into the air you breathe.  Radon can be found all over the U.S. It can get into any type of building—homes, offices, and schools—and result in a high indoor radon level.  But you and your family are most likely to get your greatest exposure at home, where you spend most of your time.

## You should test for radon.

Testing is the only way to know if you and your family are at risk from radon. EPA and the Surgeon General recommend testing all homes below the third floor for radon.  EPA also recommends testing in schools.

Testing is inexpensive and easy—it should only take a few minutes of your time. Millions of Americans have already tested their homes for radon (see page 5).

## You can fix a radon problem.

Radon reduction systems work and they are not too costly.  Some radon reduction systems can reduce radon levels in your home by up to 99%.  Even very high levels can be reduced to acceptable levels.

## New homes can be built with radon-resistant features.

Radon-resistant construction techniques can be effective in preventing radon entry. When installed properly and completely, these simple and inexpensive techniques can help reduce indoor radon levels in homes.  In addition, installing them at the time of construction makes it easier and less expensive to reduce radon levels further if these passive techniques don't reduce radon levels to below 4 pCi/L. **Every new home should be tested after occupancy, even if it was built radon-resistant.**  If radon levels are still in excess of 4 pCi/L, the passive system should be activated by having a qualified mitigator install a vent fan.  For more explanation of radon resistant construction techniques, refer to EPA publication, *Building Radon Out: A Step-by-Step Guide on How to Build Radon-Resistant Homes* (see page 15).

DocuSign Envelope ID: F3E5463B-B3F3-4922-8CD0-B94156AFA121

# HOW DOES RADON GET INTO YOUR HOME?

**Any home may have a radon problem.**

Radon is a radioactive gas.  It comes from the natural decay of uranium that is found in nearly all soils.  It typically moves up through the ground to the air above and into your home through cracks and other holes in the foundation.  Your home traps radon inside, where it can build up.  Any home may have a radon problem.  This means new and old homes, well-sealed and drafty homes, and homes with or without basements.

Radon from soil gas is the main cause of radon problems.  Sometimes radon enters the home through well water (see page 8).  In a small number of homes, the building materials can give off radon, too.  However, building

**RADON GETS IN THROUGH:**

**1. Cracks in solid floors.**

**2. Construction joints.**

**3. Cracks in walls.**

**4. Gaps in suspended floors.**

**5. Gaps around service pipes.**

**6. Cavities inside walls.**

**7. The water supply.**



materials rarely cause radon problems by themselves.

Nearly 1 out of every 15 homes in the U.S. is estimated to have elevated radon levels.  Elevated levels of radon gas have been found in homes in your state.  Contact your state radon office (www.epa.gov/radon/whereyoulive.html) for general information about radon in your area.  While radon problems may be more common in some areas, any home may have a problem.  The only way to know about your home is to test.

Radon can also be a problem in schools and workplaces.  Ask your state radon office (www.epa.gov/radon/whereyoulive.html) about radon problems in schools, daycare and childcare facilities, and workplaces in your area (also visit *www.epa.gov/radon*).

DocuSign Envelope ID: 53F5468B-B3E3-4922-8CD0-B94156AFA121

# HOW TO TEST YOUR HOME

You can't see radon, but it's not hard to find out if you have a radon problem in your home.  All you need to do is test for radon.  Testing is easy and should only take a few minutes of your time.

The amount of radon in the air is measured in "picocuries per liter of air," or "pCi/L." There are many kinds of low-cost "do it yourself" radon test kits you can get through the mail and in some hardware stores and other retail outlets.  If you prefer, or if you are buying or selling a home, you can hire a qualified tester to do the testing for you.  <u>You should first contact your state radon office about obtaining a list of qualified testers.</u>  You can also contact a private radon proficiency program for lists of privately certified radon professionals serving your area.  For links and more information, visit *www.epa.gov/radon/radontest.html.*

## There are Two General Ways to Test for Radon:

### SHORT-TERM TESTING:
*The quickest way to test is with short-term tests.  Short-term tests remain in your home for two days to 90 days, depending on the device.  "Charcoal canisters," "alpha track," "electret ion chamber," "continuous monitors," and "charcoal liquid scintillation" detectors are most commonly used for short-term testing.  Because radon levels tend to vary from day to day and season to season, a short-term test is less likely than a long-term test to tell you your year-round average radon level.  If you need results quickly, however, a short-term test followed by a second short-term test may be used to decide whether to fix your home (see also page 7 under Home Sales).*

### LONG-TERM TESTING:
*Long-term tests remain in your home for more than 90 days.  "Alpha track" and "electret" detectors are commonly used for this type of testing.  A long-term test will give you a reading that is more likely to tell you your home's year-round average radon level than a short-term test.*

## How To Use a Test Kit:

Follow the instructions that come with your test kit.  If you are doing a short-term test, close your windows and outside doors and keep them closed as much as possible during the test.  Heating and air conditioning system fans that re-circulate air may be operated.  Do not operate fans or other machines which bring in air from outside.  Fans that are part of a radon-reduction system or small exhaust fans operating only for short periods of time may run during the test.  If you are doing a short-term test lasting just 2 or 3 days, be sure to close your windows and outside doors at least 12 hours **before** beginning the test, too.  You should not conduct

**Testing is easy and should only take a few minutes of your time.**

# HOW TO TEST YOUR HOME *continued*

short-term tests lasting just 2 or 3 days during unusually severe storms or periods of unusually high winds.  The test kit should be placed in the lowest lived-in level of the home (for example, the basement if it is frequently used, otherwise the first floor).  It should be put in a room that is used regularly (like a living room, playroom, den, or bedroom) but **not** your kitchen or bathroom.  Place the kit at least 20 inches above the floor in a location where it won't be disturbed—away from drafts, high heat, high humidity, and exterior walls.  Leave the kit in place for as long as the package says.  Once you've finished the test, reseal the package and send it to the lab specified on the package right away for analysis.  You should receive your test results within a few weeks.

## *EPA Recommends the Following Testing Steps:*

**Step 1.**  *Take a short-term test.  If your result is 4 pCi/L or higher, take a follow-up test (Step 2) to be sure.*

**Step 2.**  *Follow up with either a long-term test or a second short-term test:*

- *For a better understanding of your year-round average radon level, take a long-term test.*

- *If you need results quickly, take a second short-term test.*

*The higher your initial short-term test result, the more certain you can be that you should take a short-term rather than a long-term follow up test.  If your first short-term test result is more than twice EPA's 4 pCi/L action level, you should take a second short-term test immediately.*

**Step 3.**
- *If you followed up with a long-term test:  Fix your home if your long-term test result is 4 pCi/L or more.*

- *If you followed up with a second short-term test:  The higher your short-term results, the more certain you can be that you should fix your home. Consider fixing your home if the average of your first and second test is 4 pCi/L or higher (see also page 7 under Home Sales).*



DocuSign Envelope ID: 53F5468B-B3E3-4922-8CD0-B94156AFA121

# WHAT YOUR TEST RESULTS MEAN

The average indoor radon level is estimated to be about 1.3 pCi/L, and about 0.4 pCi/L of radon is normally found in the outside air.  The U.S. Congress has set a long-term goal that indoor radon levels be no more than outdoor levels.  While this goal is not yet technologically achievable in all cases, most homes today *can* be reduced to 2 pCi/L or below.

Sometimes short-term tests are less definitive about whether or not your home is above 4 pCi/L.  This can happen when your results are close to 4 pCi/L.  For example, if the average of your two short-term test results is 4.1 pCi/L, there is about a 50% chance that your year-round average is somewhat below 4 pCi/L.  However, EPA believes that any radon exposure carries some risk—no level of radon is safe.  Even radon levels below 4 pCi/L pose some risk, and you can reduce your risk of lung cancer by lowering your radon level.

If your living patterns change and you begin occupying a lower level of your home (such as a basement) you should retest your home on that level.

Even if your test result is below 4 pCi/L, you may want to test again sometime in the future.

*Test your home now and save your results.  If you find high radon levels, fix your home before you decide to sell it.*

## RADON AND HOME SALES

*More and more, home buyers and renters are asking about radon levels before they buy or rent a home. Because real estate sales happen quickly, there is often little time to deal with radon and other issues.  The best thing to do is to test for radon NOW and save the results in case the buyer is interested in them.  Fix a problem if it exists so it won't complicate your home sale.  If you are planning to move, review EPA's pamphlet "Home Buyer's and Seller's Guide to Radon," which addresses some common questions (www.epa.gov/radon/ pubs/realestate.html).  You can also use the results of two short-term tests done side-by-side (four inches apart) to decide whether to fix your home.*

*During home sales:*

*• Buyers often ask if a home has been tested, and if elevated levels were reduced.*

*• Buyers frequently want tests made by someone who is not involved in the home sale.  Your state radon office (www.epa.gov/radon/whereyoulive.html) can assist you in identifying a qualified tester.*

*• Buyers might want to know the radon levels in areas of the home (like a basement they plan to finish) that the seller might not otherwise test.*

*Today many homes are built to help prevent radon from coming in.  Building codes in your state or local area may require these radon-resistant construction features.  If you are buying or renting a new home, ask the owner or builder if it has radon-resistant features.  The EPA recommends building new homes with radon-resistant features in high radon potential (Zone 1) areas.  Even if built radon-resistant, every new home should be tested for radon after occupancy. If you have a test result of 4 pCi/L or more, consult a qualified mitigator (http://www.epa.gov/radon/fixyourhome.html) to estimate the cost of upgrading to an active system by adding a vent fan to reduce the radon level. In an existing home, the cost to install a radon mitigation system is about the same as for other common home repairs.*

# RADON IN WATER

There are two main sources for the radon in your home's indoor air, the soil and the water supply. Compared to radon entering the home through water, radon entering your home through the soil is usually a much larger risk.



The radon in your water supply poses an inhalation risk and an ingestion risk. Research has shown that your risk of lung cancer from breathing radon in air is much larger than your risk of stomach cancer from swallowing water with radon in it. Most of your risk from radon in water comes from radon released into the air when water is used for showering and other household purposes.

Radon in your home's water is not usually a problem when its source is surface water. A radon in water problem is more likely when its source is ground water, e.g., a private well or a public water supply system that uses ground water. If you are concerned that radon may be entering your home through the water and your water comes from a public water supply, contact your water supplier.

If you've tested your private well and have a radon in water problem, it can be fixed. Your home's water supply can be treated in two ways. Point-of-entry treatment can effectively remove radon from the water before it enters your home. Point-of-use treatment devices remove radon from your water at the tap, but only treat a small portion of the water you use and are not effective in reducing the risk from breathing radon released into the air from all water used in the home.

For more information, call EPA's Drinking Water Hotline at (800) 426-4791 or visit *www.epa.gov/safewater/radon.html*. If your water comes from a private well, you can also contact your state radon office.

**If you've tested the air in your home and found a radon problem, and your water comes from a well, have your water tested.**

DocuSign Envelope ID: F3F5A63B-B3F3-4922-8CD0-B94156AFA121

# HOW TO LOWER THE RADON LEVEL IN YOUR HOME

Since there is no known safe level of radon, there can always be some risk.  But the risk can be reduced by lowering the radon level in your home.

There are several proven methods to reduce radon in your home, but the one primarily used is a vent pipe system and fan, which pulls radon from beneath the house and vents it to the outside.  This system, known as a soil suction radon reduction system, does not require major changes to your home.  Sealing foundation cracks and other openings makes this kind of system more effective and cost-efficient.  Similar systems can also be installed in houses with crawl spaces.  Radon contractors can use other methods that may also work in your home.  The right system depends on the design of your home and other factors.

Ways to reduce radon in your home are discussed in EPA's *Consumer's Guide to Radon Reduction*.  You can get a copy at *www.epa.gov/radon/pubs*.

The cost of reducing radon in your home depends on how your home was built and the extent of the radon problem.  Most homes can be fixed for about the same cost as other common home repairs.  The cost to fix can vary widely; consult with your state radon office or get one or more estimates from qualified mitigators.  The cost is much less if a passive system was installed during construction.

> ### *RADON AND HOME RENOVATIONS*
>
> *If you are planning any major structural renovation, such as converting an unfin-ished basement area into living space, it is especially important to test the area for radon before you begin the renovation.  If your test results indicate a radon problem, radon-resistant techniques can be inexpensively included as part of the renovation.  Because major renovations can change the level of radon in any home, always test again after work is completed.*



# HOW TO LOWER THE RADON LEVEL IN YOUR HOME *continued*

**Most homes can be fixed for about the same cost as other common home repairs.**

Lowering high radon levels requires technical knowledge and special skills.  You should use a contractor who is trained to fix radon problems.  A qualified contractor can study the radon problem in your home and help you pick the right treatment method.

Check with your state radon office for names of qualified or state certified radon contractors in your area.  You can also contact private radon proficiency programs for lists of privately certified radon professionals in your area.  For more information on private radon proficiency programs, visit *www.epa.gov/radon/radontest.html*.  Picking someone to fix your radon problem is much like choosing a contractor for other home repairs—you may want to get references and more than one estimate.

*If you are considering fixing your home's radon problem yourself, you should first contact your state radon office for guidance and assistance (www.epa.gov/radon/whereyoulive.html).*

You should also test your home again after it is fixed to be sure that radon levels have been reduced.  Most soil suction radon reduction systems include a monitor that will indicate whether the system is operating properly.  In addition, it's a good idea to retest your home every two years to be sure radon levels remain low.



*Note:  This diagram is a composite view of several mitigation options. The typical mitigation system usually has only one pipe penetration through the basement floor; the pipe may also be installed on the outside of the house.*

DocuSign Envelope ID: 53F5463B-B3E3-4922-8CD0-B94156AFA121

# THE RISK OF LIVING WITH RADON

Radon gas decays into radioactive particles that can get trapped in your lungs when you breathe.  As they break down further, these particles release small bursts of energy.  This can damage lung tissue and lead to lung cancer over the course of your lifetime.  Not everyone exposed to elevated levels of radon will develop lung cancer.  And the amount of time between exposure and the onset of the disease may be many years.

   Like other environmental pollutants, there is some uncertainty about the magnitude of radon health risks.  However, we know more about radon risks than risks from most other cancer-causing substances.  This is because estimates of radon risks are based on studies of cancer in humans (underground miners).

   Smoking combined with radon is an especially serious health risk. Stop smoking and lower your radon level to reduce your lung cancer risk.

   Children have been reported to have greater risk than adults of certain types of cancer from radiation, but there are currently no conclusive data on whether children are at greater risk than adults from radon.

**Your chances of getting lung cancer from radon depend mostly on:**

- *How much radon is in your home*

- *The amount of time you spend in your home*

- *Whether you are a smoker or have ever smoked*

*Scientists are more certain about radon risks than risks from most other cancer-causing substances.*



# THE RISK OF LIVING WITH RADON *continued*

## RADON RISK IF YOU SMOKE

| Radon Level | If 1,000 people who smoked were exposed to this level over a lifetime*. . . | The risk of cancer from radon exposure compares to**. . . | WHAT TO DO: Stop Smoking and. . . |
|---|---|---|---|
| 20 pCi/L | About 260 people could get lung cancer | ◄ 250 times the risk of drowning | Fix your home |
| 10 pCi/L | About 150 people could get lung cancer | ◄ 200 times the risk of dying in a home fire | Fix your home |
| 8 pCi/L | About 120 people could get lung cancer | ◄ 30 times the risk of dying in a fall | Fix your home |
| 4 pCi/L | About 62 people could get lung cancer | ◄ 5 times the risk of dying in a car crash | Fix your home |
| 2 pCi/L | About 32 people could get lung cancer | ◄ 6 times the risk of dying from poison | Consider fixing between 2 and 4 pCi/L |
| 1.3 pCi/L | About 20 people could get lung cancer | (Average indoor radon level) | (Reducing radon levels below 2 pCi/L is difficult) |
| 0.4 pCi/L | | (Average outdoor radon level) | |

Note: If you are a former smoker, your risk may be lower.

*It's never too late to reduce your risk of lung cancer. Don't wait to test and fix a radon problem. If you are a smoker, stop smoking.*

## RADON RISK IF YOU'VE NEVER SMOKED

| Radon Level | If 1,000 people who never smoked were exposed to this level over a lifetime*. . . | The risk of cancer from radon exposure compares to**. . . | WHAT TO DO: |
|---|---|---|---|
| 20 pCi/L | About 36 people could get lung cancer | ◄ 35 times the risk of drowning | Fix your home |
| 10 pCi/L | About 18 people could get lung cancer | ◄ 20 times the risk of dying in a home fire | Fix your home |
| 8 pCi/L | About 15 people could get lung cancer | ◄ 4 times the risk of dying in a fall | Fix your home |
| 4 pCi/L | About 7 people could get lung cancer | ◄ The risk of dying in a car crash | Fix your home |
| 2 pCi/L | About 4 people could get lung cancer | ◄ The risk of dying from poison | Consider fixing between 2 and 4 pCi/L |
| 1.3 pCi/L | About 2 people could get lung cancer | (Average indoor radon level) | (Reducing radon levels below 2 pCi/L is difficult) |
| 0.4 pCi/L | | (Average outdoor radon level) | |

Note: If you are a former smoker, your risk may be higher.
*Lifetime risk of lung cancer deaths from *EPA Assessment of Risks from Radon in Homes* (EPA 402-R-03-003).
**Comparison data calculated using the Centers for Disease Control and Prevention's 1999-2001 National Center for Injury Prevention and Control Reports.

DocuSign Envelope ID: 53E5468B-B3E3-4922-8CD0-B94456AFA121

# RADON MYTHS AND FACTS

**MYTH:** *Scientists aren't sure radon really is a problem.*

**FACT:** **Although some scientists dispute the precise number of deaths due to radon, all major health organizations (like the Centers for Disease Control, the American Lung Association and the American Medical Association) agree with estimates that radon causes thousands of preventable lung cancer deaths every year. This is especially true among smokers, since the risk to smokers is much greater than to non-smokers.**

**MYTH:** *Radon testing is difficult, time consuming and expensive.*

**FACT:** **Radon testing is easy. You can test your home yourself or hire a qualified radon test company. Either approach takes only a small amount of time and effort.**

**MYTH:** *Homes with radon problems can't be fixed.*

**FACT:** **There are simple solutions to radon problems in homes. Hundreds of thousands of homeowners have already fixed radon problems in their homes. Most homes can be fixed for about the same cost as other common home repairs; check with one or more qualified mitigators. Call your state radon office (www.epa.gov/radon/whereyoulive.html) for help in identifying qualified mitigation contractors.**

**MYTH:** *Radon only affects certain kinds of homes.*

**FACT:** **House construction can affect radon levels. However, radon can be a problem in homes of all types: old homes, new homes, drafty homes, insulated homes, homes with basements, homes without basements. Local geology, construction materials, and how the home was built are among the factors that can affect radon levels in homes.**

**MYTH:** *Radon is only a problem in certain parts of the country.*

**FACT:** **High radon levels have been found in every state. Radon problems do vary from area to area, but the only way to know your radon level is to test.**

**MYTH:** *A neighbor's test result is a good indication of whether your home has a problem.*

**FACT:** **It's not. Radon levels can vary greatly from home to home. The only way to know if your home has a radon problem is to test it.**

DocuSign Envelope ID: 5BF5463B-B3F3-4922-8CD0-B94156AFA121

# RADON MYTHS AND FACTS *continued*

**MYTH:** *Everyone should test their water for radon.*

**FACT:** **Although radon gets into some homes through water, it is important to first test the air in the home for radon.  If your water comes from a public water system that uses ground water, call your water supplier.  If high radon levels are found and the home has a private well, call the Safe Drinking Water Hotline at (800) 426-4791 for information on testing your water.**

**MYTH:** *It's difficult to sell homes where radon problems have been discovered.*

**FACT:** **Where radon problems have been fixed, home sales have not been blocked or frustrated.  The added protection is sometimes a good selling point.**

**MYTH:** *I've lived in my home for so long, it doesn't make sense to take action now.*

**FACT:** **You will reduce your risk of lung cancer when you reduce radon levels, even if you've lived with a radon problem for a long time.**

**MYTH:** *Short-term tests can't be used for making a decision about whether to fix your home.*

**FACT:** **A short-term test followed by a second short-term test\* can be used to decide whether to fix your home.  However, the closer the average of your two short-term tests is to 4 pCi/L, the less certain you can be about whether your year-round average is above or below that level.  Keep in mind that radon levels below 4 pCi/L still pose some risk.  Radon levels can be reduced in most homes to 2 pCi/L or below.**

*\*If the radon test is part of a real estate transaction, the result of two short-term tests can be used in deciding whether to mitigate.  For more information, see EPA's "Home Buyer's and Seller's Guide to Radon."*

DocuSign Envelope ID: 53F54C8B-B3F3-4922-8CD0-B94156AFA121

# FOR FURTHER INFORMATION

## EPA Radon Website

*www.epa.gov/radon*
EPA's radon page includes links to publications, hotlines, private proficiency programs and more.

Frequent Questions:
*http://iaq.supportportal.com*

## Radon Hotlines

### 1-800-SOS-RADON (767-7236)*
Purchase radon test kits by phone.

### 1-800-55RADON (557-2366)*
Get live help for your radon questions.

### 1-800-644-6999*
Radon Fix-It Hotline. For general information on fixing or reducing the radon level in your home.

### 1-866-528-3187*
Línea Directa de Información sobre Radón en Español.  Hay operadores disponibles desde las 9:00 AM hasta las 5:00 PM para darle información sobre radón y como ordenar un kit para hacer la prueba de radón en su hogar.

### 1-800-426-4791
Safe Drinking Water Hotline.  For general information on drinking water, radon in water, testing and treatment, and standards for radon in drinking water. Operated under a contract with EPA.

*Operated by Kansas State University in partnership with EPA.

## EPA Regional Offices

*www.epa.gov/radon/whereyoulive.html*
Check the above website for a listing of your EPA regional office.

## Ordering Radon Publications

Many EPA radon publications are available from *www.epa.gov/radon/pubs*

Radon publications may be ordered through the National Service Center for Environmental Publications (NSCEP) by calling 1-800-490-9198, by visiting the NSCEP website at *www.epa.gov/ncepihom*, or by email at nscep@bps-lmit.com



---

### Surgeon General Health Advisory

*"Indoor radon is the second-leading cause of lung cancer in the United States and breathing it over prolonged periods can present a significant health risk to families all over the country. It's important to know that this threat is completely preventable. Radon can be detected with a simple test and fixed through well-established venting techniques."*

January 2005

---

### U.S. EPA Assessment of Risks from Radon in Homes

In June 2003, the EPA revised its risk estimates for radon exposure in homes.  EPA estimates that about 21,000 annual lung cancer deaths are radon related.  EPA also concluded that the effects of radon and cigarette smoking are synergistic, so that smokers are at higher risk from radon.  EPA's revised estimates are based on the National Academy of Sciences 1998 BEIR VI (Biological Effects of Ionizing Radiation) Report which concluded that radon is the second leading cause of lung cancer after smoking.

---



United States
Environmental Protection
Agency

Indoor Environments Division (6609J)
EP 402/K-12/002 | May 2012 | www.epa.gov/radon

**Indoor Air Quality (IAQ)**

DocuSign Envelope ID: 5355462B-B3E3-4922-8CD0-B94F56AFA121

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

### Lead Warning Statement

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning.  Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory.  Lead poisoning also poses a particular risk to pregnant women.  The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards.  A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

### Property
**Address:** 5105 Claypoint Rd, Chesterfield, VA, 23832

### Seller's Disclosure

(a)  Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

(i) _____  Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

(ii) [✓]  Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)  Records and reports available to the seller (check (i) or (ii) below):

(i) _____  Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

(ii) [✓]  Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

### Purchaser's Acknowledgment (initial)

(c)  _____  Purchaser has received copies of all information listed above.

(d)  _____  Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e)  Purchaser has (check (i) or (ii) below):

(i) _____  received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint or lead-based paint hazards; or

(ii) [✓]  waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

### Agent's Acknowledgment (initial)

(f)  _____  Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

HPA Borrower 2016-2 ML LLC

*Katie Burns*   2/19/2021

_____     _____
Seller Katie Burns          , Authorized Signer Date        Seller                              Date

_____     _____
Purchaser Cicel Johnson            Date        Purchaser                          Date

_____     _____
Agent                          Date        Agent                              Date





## Central Virginia Regional MLS
## Purchase Agreement

This is a legally binding document for the purchase of real property. If not understood, seek competent advice before signing.
(Paragraphs marked with an asterisk * require a blank to be filled in or checked.)

*This Purchase Agreement (the "Agreement") is dated <u>02/19/2021</u>, 20___, between <u>Cicel Johnson</u>
_____ ("Seller"). The parties acknowledge <u>N/A</u> ("Purchaser") and <u>HPA Borrower 2016-2 ML LLC</u>
Broker") represents Seller, and <u>N/A</u> ("Selling Broker") represents Purchaser. ("Listing

**\*1. REAL PROPERTY:** Purchaser agrees to buy and Seller agrees to sell the land, all improvements thereon, and appurtenances thereto belonging, located in the City/County of <u>Chesterfield</u> _____, Virginia.
Lot ___ Block ___ Section ___ of _____ subdivision, Tax Parcel # <u>742-67-62-14-000-000</u>
and more commonly known as: <u>5105 Claypoint Rd, Chesterfield, VA, 23832</u>
together with the items of personal property described in paragraph 2 (the "Property").

**\*2. PERSONAL PROPERTY INCLUDED:** Included with the sale of the above real estate (if located within said Property at the time of signing this Agreement, unless otherwise noted) are the shades, plantation shutters, blinds, curtain and drapery rods, screens and screen doors, storm windows and doors, light fixtures, wall to wall carpeting, garbage disposal, built-in range, built-in oven, built-in dishwasher, laundry tubs, attic fan, smoke and heat detectors, awnings, electrical wiring connections for appliances, ceiling fan(s), garage door opener(s) and remotes, mailbox and post, outbuildings and sheds, gas logs, fireplace inserts and all other items attached to the real estate and being a part thereof, including all shrubbery and plantings on the Property. Also included are the following items:
<u>Buyer resides at property - any and all personal property and fixtures located thereon to the extent owned by Seller remains.</u>

**\*3. ADDENDA:** The following addenda are made a part of this Agreement:

[X] Lead-Based Paint Disclosure (required on all pre-1978 homes)  ☐ Right of First Refusal  ☐ Short Sale Addendum

[✓] "AS IS" Addendum        ☐ Other _____

**\*4. PURCHASE PRICE:** The Purchase Price of the Property is _____ Dollars
($ <u>343,100.00</u> ), which shall be paid to Seller at settlement, subject to the pro-rations described herein and/or from the following sources **[check all applicable box(es)]:**

[✓] This sale is <u>not</u> subject to financing.  Purchaser shall pay all cash at closing by bank certified funds or bank wire.

☐ This sale <u>is</u> subject to financing.  This is subject to Purchaser being able to obtain or assume a **[select loan type]:**

☐ Conventional; ☐ FHA; ☐ VA; ☐ VHDA or ☐ other _____ loan in the principal
amount of ____% of the Purchase Price **OR** $_____ ("Loan Amount"), secured by a first deed of
trust lien on the Property bearing interest at a **[select one box]:**

☐ fixed rate not exceeding ____% per year  **OR**

☐ at an adjustable rate with an initial rate not to exceed ____% per year and a maximum rate not to
exceed ___% during the term of the loan  **OR**

☐ at the prevailing rate of interest at the time of settlement.

The loan shall be amortized for a term of ___ years and shall require not more than a total of ____ discount and origination points. (For loan assumption, the balance set forth above is approximate. The principal amount to be assumed will be the outstanding principal balance on the date of settlement. Purchaser shall assume all obligations of Seller under such loan with the exception of past due charges for which Seller shall be liable).  Purchaser shall pay the balance of the Purchase Price at settlement, less any deposit, loan amount and/or other credits set forth in this Agreement.  Nothing in this Agreement prohibits Purchaser from seeking financing other than as specified above so long as settlement is not delayed and there is no cost to Seller.  Purchaser's failure to obtain such alternative financing does not relieve Purchaser from the obligations to obtain the financing specified above.

[✓] Seller agrees to pay at settlement (to be reflected on the settlement statement) the sum of $ <u>5000.00</u> towards
Purchaser's closing costs, prepaids, discount points and loan expenses.

CVR 335                                    Page 1 of 9                                    Revised 8/2017

InstanetFORMS

**\*5. APPRAISAL:** This sale **[select one]:** ☑ is **OR** ☐ is not further subject to the Property's appraised value equaling or exceeding the Purchase Price, which value shall be determined by an appraiser selected by Purchaser's lender (if a cash purchase, the appraiser shall be selected by Purchaser). **The appraisal shall be ordered within fifteen (15) days of the Date of Ratification. It shall be the responsibility of Purchaser to advise Purchaser's lender of this requirement**. If the appraisal is not ordered within 15 days of the Date of Ratification, then Seller may terminate this Agreement by written notice to Purchaser and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder. If the appraisal is ordered after the 15 day period but Seller has not yet terminated this Agreement, then Seller's right to terminate this Agreement for said purpose is waived.

Regarding the appraisal, if the Purchase Price exceeds the appraised value, Purchaser shall either: (i) proceed with consummation of this Agreement without regard to the amount of the appraised value, or (ii) make a written request to Seller within five (5) days of receipt of the appraisal for a reduction in the Purchase Price so long as the reduced Purchase Price is not lower than the appraised value, and provide Seller a copy of the appraisal (or lender verification of the appraised value). Seller shall then have five (5) days to respond to Purchaser's request for a reduction in the Purchase Price (the "Response Deadline"). If the parties are unable to agree in writing as to a Purchase Price within five (5) days following the Response Deadline, then either Purchaser or Seller may terminate this Agreement by written notice to the other party, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder. For purposes of this paragraph, Purchaser is deemed to have received a copy of the appraisal when Purchaser is notified in writing of the appraised value of the Property. If Purchaser does not request a reduction in the Purchase Price within five (5) days after receipt of the appraisal, then this condition shall be deemed waived by Purchaser.

**6. FINANCING:** If this Agreement is conditioned upon Purchaser obtaining financing, Purchaser shall make written application for such loan within seven (7) days after the Date of Ratification (as defined in Paragraph 27) and shall make diligent effort to secure a written loan commitment no later than 5:00 p.m. on the settlement date set forth in Paragraph 9. If, at the time of such loan application, Purchaser chooses not to lock-in the rate and/or points that meet or exceed the requirements set forth in Paragraph 4, Purchaser waives such rate and point contingency. If this Agreement is not conditioned upon Purchaser obtaining financing, Purchaser shall provide Seller with written verification from a third-party in possession of Purchaser's assets within seven (7) days after the Date of Ratification that Purchaser has sufficient assets to pay the balance of the Purchase Price at settlement. If Purchaser fails to comply with any of the provisions of this paragraph or fails to obtain a written loan commitment by 5:00 p.m. on the settlement date, then Seller may terminate this Agreement by written notice to Purchaser, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder. As used in this paragraph, "diligent effort" shall mean that Purchaser has provided all information or documentation requested by a lender within seven (7) days of each such request and paid all costs associated with such loan application, including but not limited to, application fees, credit reports and appraisal(s). Purchaser authorizes the lender to: (i) disclose to the Listing Broker and Selling Broker information about the progress of Purchaser's loan application and approval, including whether Purchaser has complied with the lender's requests and paid all costs associated with such application; and (ii) furnish a copy of Purchaser's loan estimate(s) and closing disclosure(s) to the Selling Broker. If, after diligent effort, Purchaser is unable to obtain financing, then this Agreement shall terminate, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

**7. WIRE FRAUD ALERT:** Criminals are hacking email accounts of real estate agents, settlement attorneys/agents and others resulting in fraudulent wire instructions being sent to divert Seller or Purchaser's funds to the criminal's account. These emails look legitimate, but they are not. *Purchaser and Seller are advised not to wire any funds without personally speaking with the intended recipient of the wire to confirm the bank routing number and account number*.

**\*8. DEPOSIT:** Purchaser shall make a deposit of $ 1,000.00      to be held by    Shaheen Law Firm, PC    (the "Escrow Agent") in the form of: ☐ check  ☐ cash  ☑ other  per escrow agent/wire      (the "Deposit"). Purchaser **[select one]:** ☑ has paid the Deposit to the Escrow Agent **OR** ☐ will pay the Deposit to the Escrow Agent within _____ days (the "Extended Deposit Date") after the Date of Ratification. If Purchaser fails to pay the Deposit as set forth herein, then Purchaser shall be in breach of this Agreement. At Seller's option and in lieu of all other remedies set forth in this Agreement, Seller may terminate this Agreement by written notice to Purchaser and neither party shall have any further obligation hereunder. If the Escrow Agent is a Virginia Real Estate Board ("VREB") licensee, the parties direct the Escrow Agent to place the Deposit in an escrow account by the end of the fifth business banking day following the latter of: (i) ratification and delivery of this Agreement as defined in Paragraph 27, or (ii) the Extended Deposit Date. If the Escrow Agent is not a VREB licensee, the parties direct the Escrow Agent to place the Deposit in an escrow account in conformance with applicable Federal or Virginia law and regulations. The Deposit may be held in an interest bearing

account and the parties waive any claim to interest resulting from such Deposit. The Deposit shall not be released by the Escrow Agent until (i) credited toward the purchase price at settlement; (ii) Seller and Purchaser agree in writing as to its disposition, (iii) a court of competent jurisdiction orders a disbursement of the funds, or (iv) disbursed in such manner as authorized by the terms of this Agreement subject to Virginia law and/or VREB Regulations. Seller and Purchaser agree that Escrow Agent shall have no liability to any party for disbursing the Deposit in accordance with this paragraph, except in the event of Escrow Agent's negligence or willful misconduct.

If the Property is foreclosed upon while this Agreement is pending, the terms of Virginia Code Section 54.1-2108.1 shall apply to the disbursement of the Deposit. The foreclosure shall be deemed a termination of this Agreement by Seller and, absent any default by Purchaser, the Deposit shall be disbursed to Purchaser.

**\*9. SETTLEMENT; POSSESSION:** Settlement shall be made at the offices of ___Shaheen Law Firm, PC___
on or before **[select one box and insert closing date]:** _60 DAYS AFTER SELLER RATIFICATION.CO_
☑ _04/12/2021_ _____ , 20_____ , or a reasonable time thereafter if the Purchaser or Seller is making diligent effort to satisfy any contingencies contained in this Agreement.

**OR**

☐ _____ , 20___ , and subject to Seller's right to cure any title defects as set forth in Paragraph 24B, if settlement does not occur within ten (10) days following such date, a party who is ready, willing and able to close under the terms of this Agreement may terminate this Agreement by written notice to the other party, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

**Possession of the Property shall be given at settlement, unless otherwise agreed in writing by the parties.** Failure to check one box above shall not invalidate this Agreement. The settlement date shall be as inserted above. Seller and Purchaser authorize and direct the settlement agent to provide a copy of Purchaser's closing disclosure (if Purchaser obtains lender financing), settlement statement and/or disbursement summary for this transaction to the Seller, Purchaser, Listing Broker and Selling Broker.

**\*10. OCCUPANCY DISCLOSURE:** Purchaser intends to **[select one]:** ☑ occupy **OR** ☐ not occupy the Property as a principal residence.

**\*11. RESIDENTIAL PROPERTY DISCLOSURE:** Seller represents the Property **[select one]:** ☑ is **OR** ☐ is not subject to the Virginia Residential Property Disclosure Act, Sections 55-517 et. seq. of the Code of Virginia, which requires the Seller of certain residential property to furnish the Purchaser with a Residential Property Disclosure Statement. Property Disclosure **[select one]:** ☑ is **OR** ☐ is not attached. (Attachment does not become part of this Agreement.)

**12. FAIR HOUSING DISCLOSURE:** All offers shall be presented and considered without regard to race, color, religion, sex, handicap, familial status, elderliness or national origin as well as all classes protected by the laws of the United States, the Commonwealth of Virginia and applicable local jurisdiction.

**\*13. PROPERTY OWNERS' ASSOCIATION DISCLOSURE:** The Seller represents that the Property **[select one]:**
☐ is **OR** ☑ is not located within a development which is subject to the Virginia Property Owners' Association Act (Sections 55-509 et. seq. of the Code of Virginia) (the "Act"). If the Property is within such a development, the Act requires the Seller to obtain from the property owners' association an association disclosure packet and provide it to the Purchaser, or Purchaser's authorized agent. The information contained in the association disclosure packet shall be current as of the specified date on the disclosure packet. The Purchaser may cancel this Agreement (a) within 3 days after the date of this Agreement, if on or before the date that the Purchaser signs this Agreement, the Purchaser receives the association disclosure packet or is notified that the association disclosure packet is not available; (b) within 3 days after receiving the association disclosure packet, if the association disclosure packet or notice that the association disclosure packet will not be available is hand delivered, delivered by electronic means or delivered by a commercial overnight delivery service or the United Parcel Service, and a receipt obtained; or (c) within 6 days after the postmark date if the association disclosure packet or notice that the association disclosure packet will not be available is sent to the Purchaser by United States mail. The Purchaser may also cancel this Agreement at any time prior to settlement if the Purchaser has not been notified that the association disclosure packet will not be available and the association disclosure packet is not delivered to the Purchaser. Notice of cancellation shall be provided to the Seller (owner) or his agent by one of the following methods: (i) hand delivery; (ii) United States mail, postage prepaid, provided the sender retains sufficient proof of mailing, which may be either a United States postal certificate of mailing or a certificate of service prepared by the sender confirming such mailing; (iii) electronic means provided the sender retains sufficient proof of the electronic delivery, which may be an electronic receipt of delivery, a confirmation that the notice was sent by facsimile, or a

certificate of service prepared by the sender confirming the electronic delivery; or (iv) overnight delivery using a commercial service or the United States Postal Service. In the event of a dispute, the sender shall have the burden to demonstrate delivery of the notice of cancellation. Such cancellation shall be without penalty, and the Seller shall cause any deposit to be returned promptly to the Purchaser, but not later than thirty days from the date of cancellation. Seller shall provide written instructions to the Association for delivery of the disclosure packet to Purchaser or Purchaser's authorized agent. The right to receive the association disclosure packet and to cancel this Agreement terminates at settlement. If the Purchaser has received the association disclosure packet, the Purchaser has a right, at Purchaser's sole expense, to request an update of such disclosure packet from the property owners' association in accordance with subsection G of Section 55-509.6 or subsection C of Section 55-509.7 as appropriate.  A request for an updated disclosure packet does not extend the cancellation periods set forth above.

**\*14. CONDOMINIUM DISCLOSURE:** The Seller represents that the Property **[select one]:**  ☐ is **OR** ☑ is not  a condominium resale, which is subject to the Virginia Condominium Act (Section 55-79.39 et seq. of the Code of Virginia) (the "Condominium Act"). If the Property is a condominium resale, the Condominium Act requires the Seller to obtain from the unit owners' association a resale certificate and provide it to the Purchaser or Purchaser's authorized agent. The information contained in the resale certificate shall be current as of the specified date on the resale certificate. The Purchaser may cancel this Agreement (a) within 3 days after the date of this Agreement, if on or before the date that the Purchaser signs this Agreement, the Purchaser receives the resale certificate; (b) within 3 days after receiving the resale certificate if the resale certificate is hand delivered, delivered by electronic means or delivered by a commercial overnight delivery service or the United Parcel Service, and a receipt obtained; or (c) within 6 days after the postmark date if the resale certificate is sent to the Purchaser by United States mail. Notice of cancellation shall be provided to the Seller (owner) or his agent by one of the following methods: (i) hand delivery; (ii) United States mail, postage prepaid, provided the sender retains sufficient proof of mailing, which may be either a United States postal certificate of mailing or a certificate of service prepared by the sender confirming such mailing; (iii) electronic means provided the sender retains sufficient proof of the electronic delivery, which may be an electronic receipt of delivery, a confirmation that the notice was sent by facsimile, or a certificate of service prepared by the sender confirming the electronic delivery; or (iv) overnight delivery using a commercial service or the United States Postal Service. In the event of a dispute, the sender shall have the burden to demonstrate delivery of the notice of cancellation. Such cancellation shall be without penalty, and the Seller shall cause any deposit to be returned promptly to the Purchaser, but not later than thirty days from the date of cancellation. Seller shall provide written instructions to the Association for the delivery of the resale certificate to Purchaser or Purchaser's authorized agent. The right to receive the resale certificate and to cancel this Agreement terminates at settlement. If the Purchaser has received the resale certificate, the Purchaser has a right, at Purchaser's sole expense, to request from the unit owners' association a resale certificate update or financial update in accordance with Section 55-79.97:1. A request for an updated resale certificate does not extend the cancellation periods set forth above.

**15. OWNERS' ASSOCIATION REPAIRS:** If a disclosure packet, resale certificate or inspection report from a Property or Condominium Owners' Association indicates the Property is not in compliance with the Association's governing documents, then Purchaser may request in writing within five (5) days from receipt of any such disclosure packet, resale certificate or inspection report that Seller, at Seller's expense, make any repairs, perform any maintenance or take any corrective action required to conform the Property to the Association's requirements prior to settlement. If any such repairs, maintenance or corrective action is not performed prior to settlement, then Purchaser may terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder. If Purchaser does not make a written request to Seller within five (5) days after receipt of the disclosure packet, resale certificate or inspection report containing such non-compliance notice, then Purchaser's right to make such request to Seller or to terminate this Agreement shall be deemed waived.

**\*16. PROPERTY INSPECTION [select one]:**

☑Purchaser waives a property inspection of the Property.

   **OR**

☐Seller hereby grants to Purchaser the right to have the Property inspected by a licensed home inspector or other person(s) selected by Purchaser at Purchaser's expense and to request repair of defects revealed and/or a Seller paid closing cost credit to Purchaser (**Purchaser's requested repairs and Seller paid closing cost credit shall be collectively referred to herein as the "Repair Request"**). Inspections may include, but are not limited to, all structural and building components and systems, radon gas, underground storage tanks, soil condition, environmental testing and engineering studies. The term "**defects**" as used in this paragraph 16 shall mean (*i a condition which impairs the normal stability, safety or use of any improvements (buildings) on the Property, or (ii) damage to any part of the*

improvements, but shall exclude any cosmetic flaws, antiquated systems or grandfathered components that are in working order but would not comply with current building code if constructed or installed today.

Purchaser shall provide Seller with all inspection reports, cost of repairs and Purchaser's written Repair Request no later than [select one]: ☐ ___ days after the Date of Ratification  OR ☐ _____ ( a.m./ p.m.) on _____. If no box is checked, the parties agree that Purchaser shall provide Seller with all inspection reports, cost of repairs and a written Repair Request no later than ten (10) days after the Date of Ratification.  In the Repair Request, Purchaser reserves the right to request certain repairs be performed by a contractor currently licensed by the Virginia Board of Contractors, but shall not request Seller to perform any inspections of the Property.  If Purchaser does not submit to Seller all inspection reports, cost of repairs and the Repair Request by said date, then Purchaser waives the right to request repairs and/or a Seller paid closing cost credit, agrees that the present condition of the Property is satisfactory, and will proceed to settlement in accordance with the Purchase Agreement. Seller shall respond in writing to Purchaser's Repair Request within seven (7) days of its receipt (the "Negotiation Period"). If Seller agrees in writing to accept such Repair Request, then the parties shall proceed to settlement. If Seller does not respond in writing within the Negotiation Period, then Seller shall be deemed to have rejected Purchaser's Repair Request.

If Purchaser's Repair Request is not accepted by Seller, then the parties may continue to negotiate the terms of the Repair Request during the Negotiation Period. Once a party rejects an offer or presents a counteroffer to the other party, then all prior offers and counteroffers made by either party regarding the Repair Request shall be deemed rejected so that only one Repair Request offer or counteroffer at a time shall be considered.  Seller may not require Purchaser to accept a Seller paid closing cost credit to Purchaser in lieu of repairs requested by Purchaser.  Further, no party may unilaterally terminate this Agreement during the Negotiation Period.

If, by 5:00 p.m. on the seventh (7th) day of the Negotiation Period, no final agreement is reached as to the Repair Request, then Purchaser shall have until 5:00 p.m. on the second (2nd) day after the end of the Negotiation Period to either: (i) terminate this Agreement by written notice to Seller, or (ii) accept in writing Seller's last offer regarding the Repair Request and proceed to settlement.  If Purchaser terminates this Agreement or fails to notify Seller of its election within the said two (2) day period, then this Agreement shall terminate, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

All repairs pursuant to Paragraph 16 shall be made in a workmanlike manner prior to settlement or such other time as agreed to by the parties. Unless otherwise agreed to by the parties, Seller shall provide Purchaser with paid receipts for all repairs prior to settlement or if repairs are to be paid from Seller's proceeds, Seller shall provide written invoices to Purchaser and the settlement agent directing disbursement of Seller's proceeds for payment of said invoices.

Seller shall have all utilities supplied to all systems prior to the inspection.  If Seller fails to have all utilities supplied to all systems prior to Purchaser's inspection, then the expiration of the inspection period set forth above shall be extended until ten (10) days following the date that Purchaser is notified by Seller that all utilities have been supplied to all systems. Purchaser and Seller, their heirs and assigns, hereby jointly and severally release and forever discharge the Listing and Selling Brokers and their real estate licensees in this transaction, from any and all liabilities, obligations, causes or action, claims and demands whatsoever arising out of or in any way connected with any or all work performed, materials furnished or inspections performed in connection with the captioned Property by contractors, suppliers or inspectors hired by them on behalf of the parties to this Agreement. Purchaser and Seller acknowledge that the provisions of this Paragraph 16 are in addition to treatments or repairs made pursuant to Paragraphs 15, 24E, 24F and 24G.

**17. DEFAULT:** If either Seller or Purchaser defaults under this Agreement, the defaulting party, in addition to all other remedies available at law or in equity, shall be liable for the brokerage fees set forth in Paragraph 19 and any brokerage fees set forth in Seller's Listing Agreement with the Listing Broker for the Property (which document is hereby incorporated herein by this reference) as if this Agreement and Seller's Listing Agreement had been performed, and for any damages and all expenses incurred by the non-defaulting party, the Listing Broker and the Selling Broker in connection with this transaction and the enforcement of this Agreement and Seller's Listing Agreement, including, without limitation, attorney's fees and court costs. Payment of a real estate broker's fee as the result of a transaction relating to the Property which occurs subsequent to a default under this Agreement, shall not relieve the defaulting party of liability for any brokerage fees due under this Agreement or Seller's Listing Agreement, or for any damages and expenses, including attorney's fees and court costs, incurred by the non-defaulting party, the Listing Broker and the Selling Broker in connection with this transaction.

**18. Choice of Settlement Agent: Chapter 27.3 (§ 55-525.16 et seq.) of Title 55 of the Code of Virginia provides that the purchaser or borrower has the right to select the settlement agent to handle the closing of this transaction. The settlement agent's role in closing this transaction involves the coordination of numerous**

administrative and clerical functions relating to the collection of documents and the collection and disbursement of funds required to carry out the terms of the contract between the parties. If part of the purchase price is financed, the lender for the purchaser will instruct the settlement agent as to the signing and recording of loan documents and the disbursement of loan proceeds. No settlement agent can provide legal advice to any party to the transaction except a settlement agent who is engaged in the private practice of law in Virginia and who has been retained or engaged by a party to the transaction for the purpose of providing legal services to that party.

**Variation by agreement:** The provisions of Chapter 27.3 (§ 55-525.16 et seq.) of Title 55 of the Code of Virginia may not be varied by agreement, and rights conferred by this chapter may not be waived. The seller may not require the use of a particular settlement agent as a condition of the sale of the property.

**Escrow, closing, and settlement service guidelines:** The Virginia State Bar issues guidelines to help settlement agents avoid and prevent the unauthorized practice of law in connection with furnishing escrow, settlement or closing services. As a party to a real estate transaction, the purchaser or borrower is entitled to receive a copy of these guidelines from his settlement agent, upon request, in accordance with the provisions of Chapter 27.3 (§ 55-525.16 et seq.) of Title 55 of the Code of Virginia.

**19. BROKERAGE FEE:** Seller authorizes and directs the settlement agent to disburse to Listing Broker and Selling Broker from the settlement proceeds their respective brokerage fees payable as a result of the sale and settlement set forth under this Agreement.  Prior to settlement, Listing Broker and/or Selling Broker shall deliver to the settlement agent a signed written statement setting forth the disbursement instructions for payment of any brokerage fees and any sales incentives payable to each broker.

**\*20. HOME WARRANTY INSURANCE:** Purchaser has been advised of the availability of a one year warranty program and ☐ declines coverage  **OR** ☑ elects to purchase the home warranty program. The cost of the _____ home warranty program is $_____  and is to be paid by ☑ Purchaser  **OR** ☐ Seller at settlement. The parties acknowledge that Listing and/or Selling Brokers and their respective licensees may receive a fee for each home warranty sold.

**21. RELATED BUSINESS AND SERVICES:** The Listing Broker and Selling Broker may engage in mortgage loan, homeowner's and title insurance, real estate settlement, home warranty and other real estate related businesses and services from which they receive compensation during the course of this transaction, in addition to the real estate brokerage fees.

**22. PURCHASER DISCLOSURE:** Purchaser warrants he/she does not own any real or personal property that must be sold and settled prior to the settlement of this Agreement, except as disclosed in this Agreement.

**\*23. ADDITIONAL TERMS:**

**24. STANDARD PROVISIONS:**

**A. EXPENSE PRORATIONS:** Seller agrees to pay the expense of preparing the deed and the applicable grantors tax, release fees, and any other fees applicable to the grantor by custom. Except as otherwise agreed herein, Purchaser shall pay all expenses incurred by Purchaser in connection with this Agreement, including without limitation, title examination fees, title insurance premiums, survey costs, recording costs and Purchaser's attorney's fees.  All taxes, assessments, interest, rent escrow deposits and other ownership fees, if any, shall be prorated as of the date of settlement. In addition to the Purchase Price, Purchaser agrees to pay Seller for all fuel oil and propane/LP gas remaining in any tanks (if applicable) at the prevailing market price as of the date of settlement.

**B. TITLE:** At settlement Seller shall convey the Property to Purchaser by a general warranty deed containing English covenants of title, free of all encumbrances, tenancies, and liens (for taxes or otherwise), but subject to such restrictive

covenants and utility easements of record which do not materially and adversely affect the use of the Property for residential purposes or render the title unmarketable. If the Property does not abut a public road, title to the Property must include a recorded easement providing adequate access thereto. In the event this sale is subject to a financing contingency under Paragraph 4, the access to a public road must be acceptable to the lender. If the examination reveals a title defect that can be remedied by legal action or otherwise within a reasonable time, Seller, at his/her expense, shall promptly take such action as is necessary to cure such defect. If the defect is not cured within sixty (60) days after Seller receives notice of the defect, then either party may terminate this Agreement at the expiration of such sixty (60) day period by written notice to the other party. Upon termination of this Agreement, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder. The parties agree that the settlement date prescribed in Paragraph 9 shall be extended if necessary to enable Seller to cure any title defect, but not for more than sixty (60) days, time being of the essence.

**C. LAND USE ASSESSMENT:** In the event the Property is taxed under land use assessment and this sale results in disqualification from land use eligibility, Seller shall pay any rollback taxes assessed. If the Property continues to be eligible for land use assessment, Purchaser agrees to make application at Purchaser's expense for continuation under land use, and to pay any rollback taxes resulting from failure to file or to qualify. Notwithstanding anything herein to the contrary, the provisions of this Paragraph C shall survive settlement and the delivery of the deed.

**D. RISK OF LOSS:** All risk of loss or damage to the Property by fire, windstorm, casualty or other cause is assumed by Seller until settlement. In the event of substantial loss or damage to the Property before settlement, Purchaser shall have the option of either (i) terminating this Agreement, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder, or (ii) affirming this Agreement, in which event Seller shall assign to Purchaser all of Seller's rights under any policies of insurance applicable to the Property.

**E. EQUIPMENT CONDITION AND INSPECTION:** Seller shall convey and Purchaser agrees to accept the Property at settlement in its physical condition at the time the Date of Ratification, except as otherwise provided herein. ~~Seller warrants that all appliances, heating and cooling equipment, plumbing systems and electrical systems will be in working order at the time of Settlement or at Purchaser's occupancy, whichever occurs first. Seller agrees to deliver the Property in broom-clean condition and to exercise reasonable and ordinary care in the maintenance and upkeep of the Property between the date this Agreement is executed by Seller and Settlement or at Purchaser's occupancy, whichever occurs first. Seller grants to Purchaser or his representatives the right to make a pre-occupancy or pre-settlement inspection to verify that the condition of the Property conforms to this Agreement and to ensure that repairs, if any, have been completed.~~

**\*F. WELL, SEPTIC OR MUNICIPAL SYSTEMS:** The Property is served by **[select one]:** ☐ a well **OR** ☐ municipal water system. The Property is served by **[select one]:** ☑ a septic system **OR** ☐ municipal sewage system. If one or more municipal systems is selected and it is determined prior to settlement by the municipality or a Virginia licensed contractor that the Property is not served by such system(s), then Purchaser shall provide the written determination to Seller. Purchaser may then terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser and neither party shall have any further obligation hereunder.

If the Property is served by a well and/or septic system, Seller agrees to furnish Purchaser with a certificate dated not more than 30 days prior to settlement from a Virginia Department of General Services certified laboratory indicating that the well water is free from contamination by coliform bacteria, and a statement from a septic system contractor indicating there is no evidence of malfunction of the septic system. If Purchaser obtains a VA loan, the well water shall also be tested by Seller and certified as being free from lead contamination. Inspection of the septic system shall include **[check all applicable boxes]:**

    ☑ visual inspection of drainfield surface with rod probing
    ☑ pump contents and visual inspection of distribution box and all tanks
    ☐ other (describe): _____
    ☑ inspection per manufacturer's guidelines of alternative septic system.

If well water contamination and/or septic system malfunctions are found, Seller shall repair all malfunctions and correct the well contamination at Seller's expense. Subject to the limitation set forth in Paragraph H below, if Seller fails to comply with any provision of this paragraph, then Purchaser may: (i) utilize the remedies set forth in Paragraph 17; (ii) accept the Property in its current condition; or (iii) terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

**\*G. WOOD INFESTATION:** Seller shall furnish Purchaser with an inspection report dated not more than 30 days prior to settlement from a Virginia licensed termite control company concerning the presence of, or damage from, termites or other wood destroying insects. If the inspection reveals active infestation or damage caused by wood destroying insects, whether past or present, to the (i) primary dwelling, (ii) any other dwelling(s) on the Property with a valid certificate of occupancy, and (iii) the following additional structures _____

_____ Seller shall have the affected area treated and have the damage repaired by a reputable company. The treatment company shall furnish a one-year warranty on such treatment. Subject to the limitation imposed by Paragraph H below, if Seller fails to comply with any provision of this paragraph, Purchaser may: (i) utilize the remedies set forth in Paragraph 17; (ii) accept the Property in its current condition; or (iii) terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder.

**\*H. LIMITATION:** If the total costs of fulfilling Seller's repair or treatment obligations set forth in Paragraphs F and G above exceeds $ 0.00 _____ ("Repair Limit"), then Seller shall have the option to: (i) fulfill Seller's obligations set forth herein; or (ii) pay or credit the Repair Limit to Purchaser and refuse to pay any excess of the Repair Limit. If Seller elects option (ii), Purchaser shall have the right to either accept the Property in its present condition (in which case the Seller shall pay or credit the Repair Limit to Purchaser at settlement), or to terminate this Agreement by written notice to Seller, and subject to the provisions of Paragraph 8, Purchaser's Deposit shall be refunded in full to Purchaser, and neither party shall have any further obligation hereunder. If no Repair Limit is entered in this paragraph, the parties agree that the amount shall be $1,000.00. The Repair Limit is independent of any obligations agreed to by Seller pursuant to Paragraph 16 or any inspection/repair addendum.

**I. VA/FHA Loans:** If a VA or FHA loan is selected in Paragraph 4, it is expressly agreed that notwithstanding any other provisions of this Agreement, Purchaser shall not be obligated to complete the purchase of the Property or incur any penalty by forfeiture of earnest money deposits or otherwise unless Purchaser has been given in accordance with HUD/FHA or VA requirements a written statement by the Federal Housing Commissioner, Veterans Administration, or a direct endorsement lender setting forth the appraised value of the Property of not less than the Purchase Price. Purchaser shall have the privilege and option of proceeding with consummation of this Agreement without regard to the amount of the appraised value. The appraised value is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value or the condition of the Property. Purchaser should satisfy himself/herself that the price and condition of the Property are acceptable.

**J.   MECHANIC'S LIEN DISCLOSURE:** Virginia law (§43-1 et seq.) permits persons who have performed labor or furnished materials for the construction, removal, repair or improvement of any building or structure to file a lien against the Property. This lien may be filed at any time after the work is commenced or the material is furnished, within 90 days from the last day of the month in which the lienor last performed work or furnished materials or 90 days from the time the construction, removal, repair or improvement is terminated. **An effective lien for work performed prior to the date of settlement may be filed after settlement. Legal counsel should be consulted.** Seller shall deliver to Purchaser at settlement an affidavit in a form acceptable to Purchaser's title company, signed by Seller, that no labor or materials have been furnished to the Property within the statutory period for the filing of mechanics' or materialmens' liens against the Property.  If labor or materials have been furnished to the Property during the statutory period, Seller shall deliver to Purchaser an affidavit signed by Seller and the person(s) furnishing the labor and/or materials that such items have been paid.

**K. NONBINDING MEDIATION:** Unless waived by mutual agreement of the parties, any disputes or claims arising out of this Agreement (except matters involving mechanics liens or licensing) shall be submitted to mediation prior to instituting arbitration or litigation. The cost of mediation will be shared equally between Purchaser and Seller. The mediation shall be non-binding, unless a satisfactory settlement has been reached. Thus, if no settlement is reached, the parties are not bound by the mediation and may pursue any course of action. If a settlement is reached, it shall be binding upon the parties. The mediation shall be provided by a mutually agreeable mediator. Judicial actions to provide provisional remedies, such as an injunction or a lis pendens, shall not be prohibited by the agreement to mediate, nor shall it waive a party's right to mediate.

**L. MISCELLANEOUS:** This Agreement represents the entire agreement between Seller and Purchaser and may not be modified or changed except by written instrument executed by the parties. This Agreement shall be construed according to the laws of the Commonwealth of Virginia and shall be binding upon and shall inure to the benefit of the heirs, personal representatives, successors, and assigns of the parties. To the extent any handwritten or typewritten terms herein conflict with, or are inconsistent with the pre-printed terms hereof, the handwritten or typewritten terms shall control. This Agreement may only be assigned by Purchaser with the written consent of the Seller. If the Seller agrees in writing to an assignment of this Agreement, Purchaser shall remain obligated hereunder until settlement. The parties agree that faxed or electronic transmission of any signed original document shall have the same effect as an original. As used in this

Agreement, a "day" shall mean a calendar day unless otherwise noted. For the purpose of computing time periods, the first day shall be the day following the commencement of a time period. This Agreement may be signed in one or more counterparts, each of which is deemed to be an original and all of which shall together constitute the same instrument. No party will refuse delivery of any notice from the other party in order to hinder or delay any deadline established in this Agreement. **Unless otherwise provided herein, the provisions of this Agreement affecting title shall be deemed merged into the deed delivered at settlement and shall not survive settlement.**

**25. SELLER REPRESENTATION:** Seller warrants each person signing this Agreement as Seller includes all persons possessing an ownership interest in the Property or who will be a necessary party to convey clear title to the Property.

**26. ELECTRONIC SIGNATURES.** In accordance with the Uniform Electronic Transactions Act (UETA) regarding electronic signatures and transactions, the parties do hereby expressly authorize and agree to the use of electronic (such as Authentisign) signatures as an additional method of signing and/or initialing this Agreement.

**\*27. ACCEPTANCE:** This Agreement becomes a legally binding agreement only upon ratification and delivery. Unless ratification and delivery of this Agreement occurs by _3:00_ ☐ a.m. or ☑ p.m. on _2/26/2021_____, **this offer shall expire and shall not be binding on either party.** If the parties desire to accept an offer that has expired, then (i) the date set forth in this paragraph 27 must be revised to the ratification date (or later), (ii) each party must initial such revision, and (iii) ratification and delivery must occur prior to the revised expiration date.

As used herein, "ratification and delivery" means delivery of a final accepted and signed Agreement to the other party or their respective broker or salesperson by hand delivery, fax or electronic transmission, or by a professional courier service (including overnight delivery service) or by United States mail with return receipt requested. In the event of a dispute, the sender shall have the burden to demonstrate delivery to the recipient of the final accepted and signed Agreement. "Date of Ratification" means the date upon which ratification and delivery occurs. Purchaser and Seller understand that they shall have the right to withdraw any offer at any time prior to ratification and delivery. If either party withdraws an offer, notice shall be deemed effective upon receipt. If any offer is withdrawn, all deposits shall be returned to the Purchaser at no penalty.

WITNESS the following authorized signatures:

| | |
|---|---|
| Purchaser  _Cecil Johnson_    Date  _2/22/2021_ | Seller  HPA Borrower 2016-2 ML LLC    Date<br>Katie Burns            , Authorized Signer |
| Purchaser            Date | Seller            Date |
| Purchaser            Date | Seller            Date |

*The following is for informational purposes only:*

**Selling Broker Company's Name and Address**

Office Phone _____
Office Fax _____
DPOR Firm License No.: _____

Purchaser's Authorized Agent's Information:
Name _____
Email _____
Cell No. _____
Agent's DPOR License No.: _____

**Listing Company's Name and address**

Office Phone _____
Office Fax _____
DPOR Firm License No.: _____

Seller's Authorized Agent's Information:
Name _____
Email _____
Cell No. _____
Agent's DPOR License No.: _____

COPYRIGHT©2017 by the Central Virginia Regional MLS, LLC ("CVR MLS"). All rights reserved. This form may be used only by members in good standing of the CVR MLS. The reproduction of this form, in whole or in part, or the use of the names "Central Virginia Regional MLS" or "CVR MLS", in connection with any other form, is prohibited without prior written consent of CVR MLS.

RIDER 1
to Virginia Residential Contract of Purchase
for residential property located at

5105 Claypoint Rd, Chesterfield, VA, 23832 _____ ("**Property**")

THIS RIDER 1 ("**Rider**") is made and entered into by and between Purchaser and Seller identified below and is specifically attached to and by this reference made a part of that certain Virginia Residential Contract of Purchase ("**Base Contract**") executed by the same parties in the same capacities, of even date herewith. All capitalized terms used in this Rider but not otherwise defined herein shall have the same meaning as ascribed thereto in the Base Contract, the Right to Purchase Agreement or the Lease (as applicable and as defined below). The Base Contract, as amended by this Rider (and any other amendment or rider thereto which shall be executed by Purchaser and Seller), is hereinafter referred to as the "**Contract**" or the "**Purchase Agreement**".

1. <u>Construction of Contract</u>. In the event of any conflict between the terms or provisions of this Rider and the terms or provisions of the Base Contract, the terms and provisions of this Rider shall supersede and control. Furthermore, in the event of any conflict between the terms or provisions of the Contract and the terms or provisions of the Lease or Right to Purchase Agreement, then the terms and provisions of the Contract shall supersede and control. The terms of the Contract shall be construed in accordance with their plain meaning. Purchaser acknowledges that it has had the opportunity to consult with its legal counsel regarding the Contract and that accordingly, the terms of the Contract are not to be construed against any party because of that party's role in drafting same or construed in favor of any party because that party failed to understand the legal effect of the provisions thereof.

2. <u>Condition of Property</u>. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THE CONTRACT OR IN ANY OTHER DOCUMENT EXECUTED BY SELLER PURSUANT TO THE CONTRACT AND TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW: (A) PURCHASER REPRESENTS, WARRANTS AND ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PROPERTY (referred to in the Lease and Right to Purchase Agreement as the "Premises") IN ITS "**AS-IS, WHERE-IS, WITH ALL FAULTS**" CONDITION AS OF THE EFFECTIVE DATE OF THE CONTRACT AND AS OF THE CLOSING DATE AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, HABITABILITY OR ANY OTHER WARRANTY OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER; (B) SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PROPERTY; (C) ONE OR MORE OF THE PERSONS CONSTITUTING PURCHASER, IN ITS CAPACITY AS TENANT UNDER THE RESIDENTIAL LEASE AGREEMENT ("**Lease**") WITH SELLER (OR ITS PREDECESSOR-IN-INTEREST) OF THE PROPERTY, HAS BEEN IN OCCUPANCY OF THE PROPERTY, SHALL BE DEEMED TO BE FULLY AWARE OF THE CONDITION OF THE PROPERTY AND ACKNOWLEDGES THAT IT HAS HAD AMPLE OPPORTUNITY TO INSPECT THE PROPERTY PRIOR TO EXECUTION OF THE CONTRACT; AND (D) PURCHASER ACKNOWLEDGES AND AGREES THAT, TO THE EXTENT THE PROPERTY HAS BEEN DAMAGED PRIOR TO CLOSING, PURCHASER SHALL BE DEEMED TO HAVE CAUSED AND/OR CONSENTED TO SUCH DAMAGE AND TO ACCEPT THE PROPERTY IN ITS DAMAGED CONDITION AS OF CLOSING.

IN FURTHERANCE THEREOF, TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW AND NOTWITHSTANDING ANYTHING CONTAINED IN THE BASE CONTRACT TO THE CONTRARY, SELLER SHALL HAVE NO OBLIGATION UNDER THE CONTRACT TO REPAIR OR RESTORE THE PROPERTY. PURCHASER ACKNOWLEDGES AND AGREES THAT: (I) THE PURCHASE PRICE WAS NEGOTIATED WITH THE EXPRESS UNDERSTANDING THAT PURCHASER IS RESPONSIBLE FOR THE REPAIR AND MAINTENANCE NEEDS OF THE PROPERTY PURSUANT TO THE RIGHT TO PURCHASE AGREEMENT ("**Right to Purchase Agreement**") WITH SELLER (OR ITS PREDECESSOR-IN-INTEREST) FOR THE PROPERTY AND THE CONTRACT; (II) TENANT (WHICH INCLUDES THE PURCHASER) HAS BEEN IN

## EXHIBIT A
### TO RESIDENTIAL RIGHT TO PURCHASE AGREEMENT

**(Effective as of December 31, 2016)**

| Date of Purchase Contract Closing | Baseline Purchase Price* | Maintenance Reserve | Purchase Price ** (as of the date of this Exhibit A) |
|---|---|---|---|
| Initial Lease Term (Year 1) | $ 297000 | $ 2500 | $ 299500 |
| First Renewal Lease Term (Year 2) | $ 307300 | $ 2500 | $ 309800 |
| Second Renewal Lease Term (Year 3) | $ 318000 | $ 2500 | $ 320500 |
| Third Renewal Lease Term (Year 4) | $ 329100 | $ 2500 | $ 331600 |
| Fourth Renewal Lease Term (Year 5) | $ 340600 | $ 2500 | $ 343100 |

\*    THE BASELINE PURCHASE PRICE SHALL BE CALCULATED IN ACCORDANCE WITH PARAGRAPH 22.a OF THE AGREEMENT.

\*\*   THE PURCHASE PRICE SHALL BE DETERMINED BY CALCULATING THE SUM OF (1) THE BASELINE PURCHASE PRICE (AS DEFINED IN PARAGRAPH 22.a OF THE AGREEMENT) WHICH IS SHOWN ON THIS EXHIBIT A (SUBJECT TO ADJUSTMENT IN ACCORDANCE WITH PARAGRAPH 22.a), *PLUS* (2) THE AMOUNT OF THE MAKE-READY COST PRICE ADJUSTMENT (CALCULATED IN ACCORDANCE WITH PARAGRAPH 22.b OF THE AGREEMENT), IF ANY, *MINUS* (3) THE AMOUNT OF THE MAINTENANCE RESERVE PRICE REDUCTION, IF ANY (AS DEFINED IN AND WHICH MAY BE ADJUSTED IN ACCORDANCE WITH PARAGRAPH 22.c OF THE AGREEMENT) REMAINING AS OF CLOSING.  THE PURCHASE PRICE SHALL ALSO BE SUBJECT TO ADJUSTMENT PURSUANT TO AND IN ACCORDANCE WITH THE RIGHT TO PURCHASE AGREEMENT AND/OR THE TERMS OF LEASE (INCLUDING THE REPAIR, MAINTENANCE & IMPROVEMENT ADDENDUM THERETO).

This Exhibit may be updated from time to time pursuant to and in accordance with the terms of the Agreement.

## ASSIGNMENT OF PURCHASE RIGHT AND WAIVER
(Right to Purchase Agreement)

This Assignment of Purchase Right and Waiver (the "Assignment") is made and entered into effective as of _____ by and among Summeur Roquemore ("Assignor"), Cicel Johnson _____ ("Assignee") (Assignor and Assignee are, collectively "Original Purchase Right Holder") HPA Borrower 2016-2 ML LLC ("Landlord").

WHEREAS, Landlord (or its predecessor-in-interest) and Original Purchase Right Holder have entered into those certain Residential Right to Purchase Agreement (the "RTP Agreement") and Residential Lease Agreement (the "Lease"), each dated on or about 7/28/2016 with respect to the property having a street address of 5105 Claypoint Rd, Chesterfield, VA, 23832
WHEREAS, Original Purchase Right Holder has notified Landlord of their collective desire to assign all of Assignor's rights and obligations with respect to the Premises to Assignee (individually) under the RTP Agreement (including the right to purchase the Premises) upon the terms and conditions contained in this Assignment.

NOW, THEREFORE, for and in consideration of the mutual covenants and obligations stated herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows, effective as of the date hereof:

1. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the RTP Agreement or Lease, as applicable. The foregoing recitals are incorporated hereby by this reference.

2. Assignor hereby unconditionally (a) assigns and transfers to Assignee (individually) any and all rights, title, interest and obligations Assignor may have in Assignee's capacity as Purchase Right Holder under the RTP Agreement (including but not limited to the right to purchase the Premises), (b) assigns and transfers to Assignee (individually) any and all rights Assignor may have in its capacity as Tenant under the Lease to a return of or a refund of all or any portion of the Security Deposit, prepaid Rent, pet fees or pet rent pursuant to the terms of the Lease and waives any claim it may have thereto provided that the Premises is purchased by Assignee pursuant to the RTP Agreement (it being understood and agreed that should the sale of the Premises fail to be consummated, then the terms of this Paragraph 2(b) shall be of no further force or effect), and (c) waives any and all remaining right, title and interest under the RTP Agreement. Assignee hereby assumes all of the foregoing assignments and agrees to be bound by the terms of this Assignment.

3. By its execution below, Landlord approves the foregoing assignment and confirms that Assignor is hereby released from all rights and obligations under the RTP Agreement accruing from and after the date hereof. The parties hereto agree that effective immediately, Assignor is hereby removed as a "Purchase Right Holder" under the RTP Agreement. Nothing contained in this Assignment shall modify the terms of nor release any of the parties constituting Tenant from their obligations under the Lease (except as expressly set forth herein), nor release Assignee from any obligations under the RTP Agreement, whether now existing or hereafter accruing.

4. This Assignment (a) shall be governed, construed and interpreted by, through and under the laws of the State where the Premises are located, (b) may be executed in one or more counterpart copies, all of which shall constitute and be deemed an original, but all of which together shall constitute one and the same instrument binding on the parties hereto and (c) may be executed in telecopied (faxed) or electronic mail copies, and such facsimile or portable document format (pdf) signatures shall be binding upon the parties.

Assignors:

_____
Print Name: Summeur Roquemore
Date: 2/16/2021

Assignees:

_____
Print Name(s): Cicel Johnson
Date(s): 2/16/2021

ACCEPTED AND AGREED to by
**LANDLORD:** HPA Borrower 2016-2 ML LLC

By: _____
Name and Title: Cartan Clarke     Authorized Signatory
Date: _____

DocuSign Envelope ID: 5BF5463B-B3F3-4822-8CD0-B94156AFA121

OCCUPANCY OF THE PROPERTY SINCE THE COMMENCEMENT DATE UNDER THE LEASE AND IS AND WAS IN A UNIQUE POSITION TO INVESTIGATE ALL MATTERS RELATED TO THE CONDITION OF THE PROPERTY; (III) THE CONTRACT IS BEING ENTERED INTO PURSUANT TO THE RIGHT TO PURCHASE AGREEMENT; (IV) TENANT SHALL NOT BE RELIEVED OF OBLIGATIONS ACCRUING UNDER THE LEASE PRIOR TO THE EXPIRATION OR TERMINATION THEREOF; AND (V) UPON CLOSING, PURCHASER SHALL BE DEEMED TO HAVE UNCONDITIONALLY WAIVED AND RELEASED SELLER (BOTH AS SELLER HEREUNDER AND IN ITS CAPACITY AS LANDLORD UNDER THE LEASE) FROM ANY AND ALL OBLIGATIONS SELLER MAY HAVE UNDER THE LEASE OR THE RIGHT TO PURCHASE AGREEMENT TO PERFORM ANY REPAIR OR MAINTENANCE OBLIGATIONS THEREUNDER, IT BEING UNDERSTOOD AND AGREED THAT ALL SUCH OBLIGATIONS THAT REMAIN OUTSTANDING AS OF CLOSING SHALL EXPIRE AND TERMINATE UPON CLOSING; ACCORDINGLY, SELLER SHALL HAVE NO OBLIGATION UNDER THE CONTRACT OR OTHERWISE TO REPAIR OR RESTORE ALL OR ANY PART OF THE PROPERTY AFTER CLOSING.

3.  Purchase Price. The Purchase Price contained in the Base Contract (a) was determined in accordance with the Right to Purchase Agreement and (b) was based on the initial Closing Date contained in the Base Contract (it being understood and agreed that if the scheduled Closing Date should be delayed and the actual Closing Date would result in an increase in the Purchase Price in accordance with the Right to Purchase Agreement, then the Purchase Price contained in the Contract shall automatically be increased by the same amount). Seller shall have the right to adjust the amount of the Purchase Price and/or the amount of any closing credit contained in the Contract (or any credits contained in the closing disclosure statement): (i) for any matters that were not known or finalized as of the date the Purchase Price contained in the Contract was calculated, (ii) based upon any reductions to the Repair & Maintenance Reserve (including Repair & Maintenance Costs incurred after or not known/finalized as of the Effective Date of the Contract), and (iii) as expressly permitted by the Lease and the Right to Purchase Agreement. For proration and other purposes, Purchaser shall be deemed to own the Property as of the Closing Date.

    a.  Prior to closing, Seller shall determine the outstanding balance, if any, of the Repair & Maintenance Reserve and such balance shall either (a) be given to Purchaser as a closing credit or (b) the Purchase Price shall be reduced by such amount.

    b.  Purchaser directs Seller that an amount equal to any unapplied Security Deposit and any prepaid Rent then being held by Landlord under the Lease plus the aggregate amount of any pet fees or pet deposits previously paid by Tenant to Landlord under the Lease, in each case subject to permitted setoffs as of Closing, be applied or credited against the Purchase Price (or closing costs or credits) unless otherwise agreed in writing. Seller shall have the right (but will not be required) to require written authorization from all Tenants or Purchase Right Holders confirming such direction. Upon Closing, such amounts so applied toward the Purchase Price will be deemed to have been returned to Tenant pursuant to the terms of the Lease and Landlord will have no further obligation to account for same under the Lease. The earnest money shall be applied to the Purchase Price or closing costs unless otherwise agreed in writing.

    c.  Intentionally omitted.

    As of the Effective Date of the Contract, Seller confirms that (i) the Security Deposit currently being held by Landlord under the Lease is in the amount of $ 4,100.00   and (ii) Tenant has paid pet fees under the Lease in the aggregate amount of $_____. Such amounts (adjusted as of Closing) shall be identified on the disclosure statement.

    It is expressly understood and agreed by Purchaser and Seller that any adjustments to Purchase Price contained in the Contract shall occur, if at all, prior to consummation of the Closing. Once the Closing has occurred, each party hereto waives the right to dispute the calculation of the Purchase Price (including the calculation of the Repair & Maintenance Reserve) paid pursuant to the Contract (including prorations, credits or adjustments shown on the final closing disclosure), all of which shall be final and binding on the parties to the Contract, the Lease and the Right to

DocuSign Envelope ID: F3F54G8B-B3F3-4922-8CD0-B94F56AFA121

Purchase Agreement notwithstanding anything contained therein to the contrary (however Tenant shall not be relieved of any obligations under the Lease accruing prior to the Closing).

4.  <u>Tax-Deferred Exchange</u>.  Purchaser acknowledges that Seller may be entering into the Contract in connection with a tax-deferred exchange (the **"Exchange"**) and if requested by Seller, Purchaser shall cooperate with Seller's request to effectuate such Exchange, including executing any documents, instruments or agreements reasonably requested by Seller provided Purchaser shall not be obligated to (i) expend any costs in connection with such Exchange or (ii) accept or assume any additional obligations or liabilities in connection with such Exchange.

5.  <u>Disclosures: No Contingencies or Cancellation Rights</u>.  In addition to the disclosures made pursuant to the terms of the Contract, Purchaser acknowledges and agrees that it is familiar with and has been provided with each of the Disclosures identified in the Lease and the Right to Purchase Agreement and that same shall be deemed to be incorporated into the Contract by this reference without the necessity of attaching same hereto or thereto. Furthermore, before signing the Base Contract and this Rider, Purchaser acknowledges and agrees that it has:

- received, obtained and reviewed and is familiar with all disclosures referenced in Paragraphs 21, 22, 23, 24 and 28 of the Base Contract (as applicable) together with all other specific Disclosures identified in the Lease, the Right to Purchase Agreement and the Base Contract (collectively, the **"Disclosures"**, each of which is incorporated into the Contract by this reference without the necessity of attaching same hereto or thereto);
- been provided with an opportunity to conduct a paint inspection or risk assessment for lead-based paint or lead-based paint hazards (unless required by law to be conducted by Landlord or Seller) and it has either completed such inspections and is satisfied with the results thereof or has waived the opportunity to perform such inspections;
- completed all inspections and investigations of the Property as described and suggested in the Base Contract or otherwise desired by Purchaser (collectively, the **"Purchaser Investigations"**);
- investigated the value of the Property;
- obtained, reviewed and satisfied itself with respect to any HOA or Association Documents;
- obtained any survey necessary for Purchaser to purchase the Property, if required by Purchaser's lender or if desired by Purchaser; and
- obtained an appraisal for the Property, if required by Purchaser's lender or if desired by Purchaser.

To the extent allowed by Applicable Laws, and irrespective of any language contained in the Base Contract to the contrary, Purchaser and Seller expressly acknowledge and agree that the following are **NOT** contingencies of the Contract:

- reviewing and approving all disclosure documents provided by Seller;
- approving all Disclosures;
- completing and approving all Purchaser Investigations of the Property;
- verifying the condition of the Property;
- obtaining any loan necessary for Purchaser to purchase the Property;
- obtaining, reviewing and satisfying itself with respect to any HOA or Association Documents (including the Association Disclosure Packet);
- obtaining any survey necessary for Purchaser to purchase the Property, if required by Purchaser's lender or if desired by Purchaser; or
- obtaining an appraisal for the Property, if required by Purchaser's lender or if desired by Purchaser.

To the extent the Base Contract specifies otherwise, such provisions are hereby deemed expressly amended by this Rider and **Purchaser expressly acknowledges and agrees that the same shall not constitute contingencies and Purchaser shall have no right to terminate or cancel the Contract due to any such provisions.** Notwithstanding

the foregoing, this Section 5 is subject to the Appraisal Contingency contained in Section 19 below, if such Section is applicable.

6. <u>Property Owners' Association Disclosure</u>.  Purchaser's right to receive the Association Disclosure Packet and the right to cancel the Contract pursuant to the Act (as defined in Paragraph 21 of the Base Contract) are conclusively waived if not exercised prior to the Closing under the Contract.

7. <u>Closing and Possession</u>.  Irrespective of any provision contained in the Base Contract to the contrary, Seller will not be obligated to deliver the Property to Purchaser vacant, it being understood and agreed that one or more of the persons who constitute Purchaser has been in possession of the Property pursuant to the terms of the Lease and although the Lease provides that it shall automatically terminate and expire upon the sale of the Property pursuant to the Contract, Purchaser is expressly taking title subject to any holdover by any tenant or occupant under the Lease. Keys and/or means to operate all locks, mailboxes, security systems, alarms and garage door openers have previously been provided to Purchaser and no additional copies will be provided to Purchaser except to the extent in Seller's possession.

8. <u>Survey.</u>  Seller shall not be obligated to provide Purchaser with a current survey of the Property but agrees that if it has a copy of a survey in its possession, it will provide a copy thereof to Purchaser.  Purchaser acknowledges that should its lender or the title company require a current survey of the Property, obtaining such current survey shall be Purchaser's obligation at Purchaser's sole cost.

9. <u>Title</u>.  In addition to the matters set forth in the Base Contract, Purchaser shall take title subject to, and any title insurance policy desired by Purchaser shall contain exceptions or exclusions for, the title company's standard exceptions and exclusions applicable to such form of title insurance policy as well as any matters resulting from any act, omission or acquiescence of Purchaser (or any other "Tenant" or "Occupant" under the Lease) or their respective agents, contractors or subcontractors (or anyone else claiming through Purchaser or such other "Tenant" or any Purchase Right Holder) during the Term of the Lease or any holdover.

10. <u>Condition at Closing</u>. Notwithstanding anything contained in the Base Contract to the contrary, (a) Seller will **not** be obligated to maintain the Property in substantially the same condition as on the Effective Date of the Contract, (b) Purchaser will not have the right to make a final inspection of the Property before Closing and any provisions to the contrary contained in the Base Contract are hereby modified accordingly, and (c) one or more of the persons constituting Purchaser acknowledges that it has been in possession of the Property pursuant to the terms of the Lease. Nothing contained in the Contract or in the Lease shall relieve Tenant from liability under the Lease with respect to damage or a casualty occurring on or before the Expiration Date of the Lease.

11. <u>Broker</u>.  Purchaser represents to Seller that no broker was used in connection with the Contract and no commissions, fees or other compensation shall be payable or owed to a broker as a result of the sale of the Property to Purchaser (except for any broker retained by Seller in which event Seller shall be responsible for any commission due such broker) and Purchaser shall indemnify Seller against a breach of such representation. This provision shall survive the Closing or termination of the Contract indefinitely.  All references to "Broker" contained in the Base Contract are hereby deleted.

12. <u>Legal Fees</u>.  In the event Seller or Purchaser institutes any action or proceeding against the other relating to the provisions of the Base Contract, the party not prevailing in the action or proceeding will reimburse the prevailing party for its reasonable attorneys' fees (not to exceed $1,000 in any such action inclusive of costs and expenses) incurred in connection with such action or proceeding. The term "prevailing party" shall include, without limitation, a party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense.

13. <u>Time is of Essence</u>.  The parties agree that time is of the essence for the performance of each and every covenant, term, agreement and condition contained in the Contract (including but not limited to delivery of notices and payment obligations).

14. <u>RESPA</u>.  Purchaser and Seller agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974.  In the event that either party shall fail to make appropriate disclosure when asked, such failure shall be considered a breach on the part of said party.

DocuSign Envelope ID: F3F5468B-B3F3-4922-8CD0-B94156AFA121

15. <u>Non-Terrorist</u>. Purchaser certifies that he/she/it has not been designated or named as a terrorist, a "Specially Designated National and Blocked Person," or any other banned or blocked individual or entity pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website. Purchaser shall defend, indemnify, and hold harmless Seller from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any current or future breach of the foregoing certification.

16. <u>Notices</u>. Notices may be given by a party's attorney.

17. <u>Insurance</u>. Seller shall terminate and cancel all hazard and other insurance held by it in connection with the Property as of the Closing Escrow. Purchaser shall obtain new insurance policies at the Closing, to the extent desired by Purchaser or required by Purchaser's lender.

18. <u>Contract Binding on Successors; No Purchaser Right to Assign; Joint and Several; Miscellaneous.</u> The Contract shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors, heirs and permitted assigns, it being understood and agreed that Purchaser shall not have the right to assign the Contract nor any rights or interests therein (the inclusion of "and/or successors or assigns" or similar language in the Right to Purchase Agreement or the Contract shall not constitute Seller's written consent to any names beyond those permitted by the Right to Purchase Agreement). Each person constituting Purchaser (should there be more than one) is and shall be jointly and severally liable for all obligations of Purchaser under the Contract. This Rider may be executed in one or more counterparts, each of which shall be deemed an original. Furthermore, executed counterparts of this Rider and any amendment hereto or to the Contract may be delivered by facsimile or other reliable electronic means (including emails of pdf/tif documents), and such facsimile or other electronic transmission shall be valid and binding for all purposes when transmitted to and actually received by the other party; however, each party delivering executed documents by facsimile or other electronic means agrees to provide the other party with an original, hard copy of the relevant signed documents promptly after the request of the other party. The Contract constitutes the complete and entire agreement among the parties pertaining to the sale of the Property, and no representations or oral statements of either party are binding unless contained herein (except to the extent expressly contained in the Lease or the Right to Purchase Agreement). The Contract may not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto. Neither Seller nor any of its agents has made any oral promises, representations, or agreements not contained in the Contract and no agent of Seller has any authority to waive, amend, or terminate the Contract or any part of it, and no authority to make promises, representations, or agreements that impose duties or other obligations on Seller or waives any obligation of Purchaser hereunder.

19. ☒ ☐ _____ **(This Section is applicable (a) only if checked and initialed by Seller and (b) for the first Executed Purchase Contract associated with the Right to Purchase Agreement and there shall be no Appraisal Contingency thereafter).**

<u>Appraisal Contingency</u>. Purchaser shall have the right to terminate the Contract in the event an Appraisal (defined below) obtained by Purchaser certifies an appraised value for the Property that is less than the Purchase Price ("**Appraisal Contingency**"). For purposes hereof, the "**Appraisal**" must be in writing, prepared and signed by a licensed real estate appraiser in the state in which the Property is located and must be dated no earlier than the Effective Date of the Contract and no later than the scheduled Closing Date contained in the Contract (as same may be extended in writing). In order to terminate the Contract due to an Appraisal Contingency, Purchaser must provide Seller, prior to the scheduled Closing Date, with a written notice of such termination together with a copy of the Appraisal satisfying the foregoing requirements. Promptly after such termination due to an Appraisal Contingency, the earnest money (minus any out-of-pocket costs incurred by Seller in connection with preparing for the Closing such as ordering a title commitment or obtaining a pay-off letter, which amounts shall be retained by Seller) shall be promptly refunded to Purchaser.

**IN WITNESS WHEREOF**, the undersigned have executed this Rider 1 as of the date set forth in the Base Contract to which it is attached ("**Effective Date**").

VA-PSA Rider1: 2018-01

**PURCHASER:**

Name: Cicel Johnson

Purchaser's Address (if different from the Property)

_____

Name: _____

Name: _____

Name: _____

**SELLER:**

HPA Borrower 2016-2 ML LLC                    ,
a Delaware limited liability company

Seller's Address:

120 S. Riverside Plaza, Suite 2000, Chicago, IL 60606

By: _____
Name: Katie Burns
Title:  Authorized Agent

DocuSign Envelope ID: 5B55463B-B3E3-4922-8CD0-B94F56AFA121

RIDER 2
to Virginia Residential Contract of Purchase
for residential property located at

5105 Claypoint Rd, Chesterfield, VA, 23832

("**Property**")

THIS RIDER 2 ("**Rider**") is made and entered into by and between Buyer and Seller identified below and is specifically attached to that certain [Virginia Residential Contract of Purchase] ("**Base Contract**") executed by the same parties in the same capacities, of even date herewith. All capitalized terms used in this Rider but not otherwise defined herein shall have the same meaning as ascribed thereto in the Base Contract, the Right to Purchase Agreement or the Lease (as applicable and as defined below). The Base Contract, as amended by this Rider (and any other amendment or rider thereto which shall be executed by Buyer and Seller), is hereinafter referred to as the "**Contract**".

1. <u>Construction of Contract</u>. In the event of any conflict between the terms or provisions of this Rider and the terms or provisions of the Base Contract, the terms and provisions of this Rider shall supersede and control. The terms of the Contract shall be construed in accordance with their plain meaning. Buyer acknowledges that it has had the opportunity to consult with its legal counsel regarding the Contract and that accordingly, the terms of the Contract are not to be construed against any party because of that party's role in drafting same or construed in favor of any party because that party failed to understand the legal effect of the provisions thereof. All terms and provisions of the Contract are expressly subject and subordinate to the terms of the Right to Purchase Agreement, and the terms and provisions of the Right to Purchase Agreement shall control over any conflict.

2. <u>Closing and Settlement Statements</u>. Buyer hereby authorizes the title company or attorney or other agent performing an equivalent function, as the case may be, to provide Seller with a copy of any and all title and settlement documents and related information, including without limitation information that may contain Buyer's nonpublic personal information related to Buyer's home loan financing, for Seller's recordkeeping and other business purposes. Such information shall be maintained and used by Seller in accordance with Seller's privacy policy, which is available at: https://www.homepartners.com/policy/privacy

3. <u>Miscellaneous.</u> This Rider may be executed in one or more counterparts, each of which shall be deemed an original. Furthermore, executed counterparts of this Rider and any amendment hereto or to the Contract may be delivered by facsimile or other reliable electronic means (including emails of pdf/tif documents), and such facsimile or other electronic transmission shall be valid and binding for all purposes when transmitted to and actually received by the other party, however, each party delivering executed documents by facsimile or other electronic means agrees to provide the other party with an original, hard copy of the relevant signed documents promptly after the request of the other party. The Contract constitutes the complete and entire agreement among the parties pertaining to the sale of the Property, and no representations or oral statements of either party are binding unless contained herein (except to the extent expressly contained in the Lease or the Right to Purchase Agreement). The Contract may not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto. Neither Seller nor any of its agents has made any oral promises, representations, or agreements not contained in the Contract and no agent of Seller has any authority to waive, amend, or terminate the Contract or any part of it, and no authority to make promises, representations, or agreements that impose duties or other obligations on Seller or waives any obligation of Buyer hereunder.

**IN WITNESS WHEREOF**, the undersigned have executed this Rider 2 as of the date set forth in the Base Contract to which it is attached.

Buyer _____    Address: 5105 Claypoint Rd, Chesterfield, VA, 23832
    Name: Cliet Johnson

Buyer _____    Address: 5105 Claypoint Rd, Chesterfield, VA, 23832
    Name:

Buyer _____    Address: 5105 Claypoint Rd, Chesterfield, VA, 23832
    Name:

Buyer _____    Address: 5105 Claypoint Rd, Chesterfield, VA, 23832
    Name:

1

**Seller:**

HPA Borrower 2016-2 ML LLC _____ , a Delaware limited liability company

By: _____     Address: 120 S. Riverside Plaza, Suite 2000, Chicago, IL 60606
Name: Katie Burns
Title:  Authorized Agent

DocuSign Envelope ID: 5EF54685-B3E3-4922-8CD0-B94I56AFA121



Virginia Real Estate Board
http://www.dpor.virginia.gov/Consumers/Disclosure_Forms/

# RESIDENTIAL PROPERTY DISCLOSURE STATEMENT
## ACKNOWLEDGEMENT BY SELLER AND PURCHASER

The Virginia Residential Property Disclosure Act (§ 55.1-700 et seq. of the *Code of Virginia*) requires the owner of certain residential real property—whenever the property is to be sold or leased with an option to buy—to provide notification to the purchaser of any disclosures required by the Act and to refer the purchaser to the Real Estate Board website referenced below for additional information.

Certain transfers of residential property are excluded from this requirement (see § 55.1-702).

**PROPERTY ADDRESS/**
**LEGAL DESCRIPTION:**     5105 Claypoint Rd, Chesterfield, VA, 23832

The purchaser is advised to consult the RESIDENTIAL PROPERTY DISCLOSURE STATEMENT webpage (http://www.dpor.virginia.gov/Consumers/Residential_Property_Disclosures) for important information about disclosures required by law that may affect the buyer's decision to purchase the real property described above.

**The owner(s) hereby provides notification** as required under the Virginia Residential Property Disclosure Act (§ 55.1-700 et seq. of the *Code of Virginia*) and, if represented by a real estate licensee as provided in § 55.1-712, further acknowledges having been informed of the rights and obligations under the Act.

*Katie Burns*

Owner  HPA Borrower 2016-2 ML LLC                           Owner
        Katie Burns                        , Authorized Signer
2/19/2021
_____                                    _____
Date                                               Date

**The purchaser(s) hereby acknowledges receipt of notification** of disclosures as required under the Virginia Residential Property Disclosure Act (§ 55.1-700 et seq. of the *Code of Virginia*). In addition, if the purchaser is (i) represented by a real estate licensee or (ii) not represented by a real estate licensee but the owner is so represented as provided in § 55.1-712, the purchaser further acknowledges having been informed of the rights and obligations under the Act.

Purchaser  Cicel Johnson                                   Purchaser

2/22/2021
_____                                    _____
Date                                               Date

DPOR rev 10/01/19

DocuSign Envelope ID: 5F5468B-B3E3-4922-8CD0-B9A156AFA121
DocuSign Envelope ID: F3FF463D-B3F3-4022-8CD0-B941E6AFA121

Commonwealth of Virginia
Department of Professional and Occupational Regulation
9960 Mayland Drive, Suite 400
Richmond, Virginia 23233-1485
(804) 367-8595
www.dpor.virginia.gov



Department of Professional and Occupational Regulation

### Board for Asbestos, Lead and Home Inspectors
### VIRGINIA LEAD LICENSING CONSUMER INFORMATION SHEET

Pursuant to 18VAC15-30-510 of the *Virginia Lead-Based Paint Activities Regulations* the following situations and relationships between license categories are considered a conflict of interest and are prohibited:

It is a conflict of interest for a *lead abatement contractor* to enter into a contract to perform a lead abatement project if the *lead inspection* or *project design* is to be performed by individuals with an employer/employee relationship with, or financial interest in, the lead abatement contractor, unless the contractor provides the building owner with the Virginia Lead Licensing Consumer Information Sheet and a Virginia Lead Licensing **Inspector/Risk Assessor/Project Designer/Contractor Disclosure Form.** Any employer/employee or financial interest relationships must be disclosed and the disclosure form must be signed and dated by the building owner, or his agent, and the contracting entity prior to the signing of any contract to conduct lead-based paint activities. The contractor shall provide the disclosure form to all parties involved in the lead abatement project. The disclosure form shall be kept on the lead abatement project site and available to review.

Persons licensed to perform post-abatement clearance procedures shall be independent of and have no financial interest in or an employer/employee relationship with the licensed *lead abatement contractor.*

Before signing any contract, you should ask to see the Virginia Lead Abatement Contractor, Worker, Supervisor, Inspector, Risk Assessor, or Project Designer license to verify that it has not expired and that the licensee is working within the limits of his license and training requirements. **No Individual or Company May Work With An Expired License!** *There is no grace period on an expired license.*

The Board for Asbestos, Lead, and Home Inspectors does not have the authority to order a licensee to make restitution to you for losses you may incur due to poor performance by the licensee. Efforts to recover such funds must be litigated in the civil courts. You should carefully review the contract before signing it to ensure that the terms of agreement are clear and acceptable to you. As the building owner and originator of the lead-based paint hazard, you can be found liable if the licensee does not adhere to all federal, state, and local laws and regulations.

Should you have a reason to believe that a lead licensee may not have complied with all federal, state, and local laws and regulations, you should notify the Department of Professional and Occupational Regulation by calling (804) 367-8595 or writing to the *Executive Director, Virginia Board for Asbestos, Lead, and Home Inspectors, Department of Professional and Occupational Regulation,* 9960 Mayland Drive, Suite 400, Richmond, Virginia 23233-1485.

## Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Property Address:** 5105 Claypoint Rd, Chesterfield, VA, 23832

**Seller's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

(i) _____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

(ii) [✔] Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

(i) _____ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

(ii) [✔] Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

(c) _____ Purchaser has received copies of all information listed above.

(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e) Purchaser has (check (i) or (ii) below):

(i) _____ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

(ii) [✔] waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

HPA Borrower 2016-2 ML LLC

| Seller Katie Burns | , Authorized Signer Date 2/19/2021 | Seller | Date |
| Purchaser Cicel Johnson | Date 2/22/2021 | Purchaser | Date |
| Agent | Date | Agent | Date |